Jeffrey Ratliff
rgilbertson@qwestoffice.com
**RANSOM GILBERTSON MARTIN**
**& RATLIFF, LLP**
1500 NE Irving Street, Suite 412
Portland, Oregon 97232
Tel: 503-226-3664
*Liaison Counsel for Plaintiffs*

Leigh Handelman Smollar
lsmollar@pomlaw.com
Patrick V. Dahlstrom
pdahlstrom@pomlaw.com
**POMERANTZ LLP**
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

Jeremy A. Lieberman
jalieberman@pomlaw.com
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
Tel: 212-661-1100

Laurence M. Rosen
lrosen@rosenlegal.com
Phillip Kim
pkim@rosenlegal.com
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
Tel: 212-686-1060
*Co-Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| IN RE GALENA BIOPHARMA, INC. SECURITIES LITIGATION, | CASE No.:3:14-cv-00367-SI<br><br>**LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

Material Misrepresentations and Omissions ..........................................3

Loss Causation ...................................................................................4

Scienter ..........................................................................................6

BACKGROUND ......................................................................................7

The Pump ........................................................................................7

The Dump ........................................................................................9

ARGUMENT ........................................................................................12

I.     PLAINTIFFS PROPERLY PLEAD §10(B) CLAIMS FOR SECURITIES
      FRAUD ...................................................................................12

     A.  Applicable Standards .......................................................12

     B.  Plaintiff's Properly Plead Scheme Liability Against Galena, Ahn, Bernarda,
       DreamTeam and Lidingo ..................................................14

     C.  Defendants Made Material False Statements and/or Omissions ....................18

       1.  False Statements and Omissions in Galena's S.E.C. filings and Press
         Releases ...............................................................18

       2.  Galena's False Statements and Omissions in Promotional Articles ........18

         a.  Defendants Made the False Statements Through Their Agents,
           DreamTeam and Lidingo .................................................18

         b.  *Janus* is Inapplicable to the Facts Present Here ..................19

       3.  Material Omissions ........................................................21

       4.  Defendants' Had a Duty to Disclose ........................................23

     D.  Plaintiffs Have Properly Pled *Scienter* ..........................................25

i

1.  Defendants Had Actual Knowledge........................................................ 26

      a.  Galena ...................................................................................28

      b.  DreamTeam/Lidingo................................................................ 29

      c.  Galena Officer Defendants  ....................................................29

2.  Motive to Inflate Galena Stock .......................................................... 30

      a.  Defendants' Stock Sales Create a Strong Inference of *Scienter* .........30

      b.  The Secondary Offering Raises an Inference of *Scienter* ...................33

3.  Ahn and Bernarda's Conduct Violated Galena's Written Internal
    Policies .............................................................................................33

4.  Plaintiff's Inference of Fraud is More Compelling and Cogent ...............34

E.  Reliance is Properly Alleged .......................................................................35

      1.  Reliance is Properly Alleged Under 10(b)(5)(b)  .....................................35

      2.  Reliance is Properly Alleged Under 10(b)-(5)(a) and (c)  ........................36

F.  Loss Causation is Properly Alleged..............................................................38

II.   THE CAC PROPERLY PLEADS CLAIMS UNDER SECITON 20(a) OF THE
      EXCHANGE ACT .......................................................................................42

      A.  Plaintiffs Have Sufficiently Pled that Ahn, Dunlap and Bernarda Established
          Control Over Galena ..........................................................................43

      B.  Plaintiffs Have Sufficiently Pled that Outside Officer Defendants
          Established Control Over Galena and/or DreamTeam  ................................46

      C.  Plaintiffs' Have Properly Alleged That Galena Controlled Dream Team
          and Lidingo ......................................................................................47

III.  THE CAC PROPERLY PLEADS CLAIMS UNDER SECITON 20A OF THE
      EXCHANGE ACT..........................................................................................49

CONCLUSION .......................................................................................................51

ii

**TABLE OF AUTHORITIES**

**Cases**

*Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741(1972) ...................................................................................................35

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002)..................................................... 26

*Arthur Children's Trust v. Keim,* 994 F.2d 1390 (9th Cir.1993) ......................................43, 46

*Basic Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978 (1988) .............................................35, 37

*Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHX), 2008 WL 2676364 (C.D. Cal. July 1, 2008) ...........................................................................................32

*Bell At. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................12

*Bridge By & Through Severson v. Carver*, 148 Or. App. 503, 941 P.2d 1039 (1997) ..........19

*Burnett v. Rowzee*, 561 F.Supp.2d 1120 (C.D.Cal.2008) .......................................................15

*Carlson v. Xerox Corp.* 392 F.Supp.2d 267 (D. Conn. 2005)………………………………….30

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ...............................................................15

*Cf. Ganino v. Citizens Utils. Co.,* 228 F.3d 154 (2d Cir.2000) .............................................39

*DeMarco v. Robertson Stephens Inc.*, 228 F.R.D. 468 (S.D.N.Y. 2005) ........................23, 36

*Erica P. John Fund, Inc. v. Halliburton Co.*, 718 F.3d 423 (5th Cir.) ..................................38

*Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ........................................................................................47

*Fearing v. Bucher*, 328 Or. 367, 977 P.2d 1163 (1999) .......................................................19

*Fecht v. Price Co.,* 70 F.3d 1078 (9th Cir.1995) .................................................................. 14

*In re Galena Biopharma, Inc. Derivative Litig.*, No. 3:14-CV-382-SI, 2015 WL 455385 (D. Or. Feb. 4, 2015)………………………………………………………………………..28, 41

*Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D. Mass. 2005) .................................................23

iii

*Gebhart v. S.E.C.,* 595 F.3d 1034 (9th Cir. 2010) ...........................................14, 25

*Gompper v. VISX, Inc.,* 298 F.3d 893 (9th Cir.2002) ........................................ 26

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ............................35, 38

*Hawaii Ironworkers Annuity Trust Fund v. Cole*, No. 3:10CV371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011) ...........................................................................15, 16

*Hayley v. Parker*, 2002 WL 925322 (C.D. Cal. March 15, 20012) ........................................45

*Hevesi v. Citigroup Inc.*, 366 F.3d 70 (2d Cir. 2004) ...........................................36

*Howard v. Everex Sys., Inc.*, 228 F.3d 1057 (2000) ........................................... 42

*IBEW Local 98 Pension Fund v. Best Buy Co.*, No. CIV. 11-429 DWF/FLN, 2014 WL 4746195, (D. Minn. Aug. 6, 2014) ...............................................38, 41

*In re Adaptive Broadband Sec. Litig.,* 2002 WL 989478 (N.D.Cal. Apr. 2, 2002) ..........45, 49

*In re Allstate Life Ins. Co.* CV-09-08162-PCT-GMS, 2013 WL 5161688 (D. Ariz. Sept. 13, 2013) .......................................................................................43

*In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009 (C.D. Cal. 2008) ....................................45

*In re Apple Computer, Inc., Sec. Litig.,* 243 F.Supp.2d 1012 (N.D.Cal.2002) ......................27

*In re Apollo Grp., Inc. Sec. Litig.*, No. CV-10-1735-PHX-JAT, 2011 WL 5101787 (D. Ariz. Oct. 27, 2011) .................................................................................. 41

*In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F.Supp.2d 1181 (N.D. Cal. 2010) ..............49

*In re Complete Mgmt., Inc. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001).................... 33

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...............50

*In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34 (D. Mass. 2006) ......................23, 36

*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) .......................................................12, 33

*In re Epitope, Inc. Sec. Litig.*, No. CIV. 92-759-RE, 1992 WL 427842 (D. Or. Nov. 30, 1992) ...............................................................................45, 49

*In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) ............................................ 13

*In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983 (S.D. Cal. 2005) ...................... 12, 26

*In re Impac Mortg. Holdings, Inc. Securities Litigation,* 554 F.Supp.2d 1083
(C.D.Cal.2008) .................................................................................................................. 27

*In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................. 23, 36

*In re J.P. Jeanneret Associates, Inc.,* 769 F. Supp. 2d 340 (S.D.N.Y. 2011) ........................ 35

*In re Lason, Inc. Sec. Litig.*, 143 F. Supp. 2d 855 (E.D. Mich. 2001) ................................... 33

*In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 16 (D. Mass. 2003) ........................... 37

*In re Maxim Integrated Products, Inc. Sec. Litig.*, 639 F. Supp. 2d 1038 (N.D. Cal. 2009).. 39

*In re Marsh & Mclennan Companies, Inc. Securities Litigation,* 501 F.Supp.2d 452
(S.D.N.Y.2006) .................................................................................................................. 27

*In re Metawave Communications Corp. Sec. Litig.*, 298 F. Supp. 2d 1056
(W.D. Wash. 2003) ............................................................................................................ 49

*In re Micron Tech., Inc., Sec. Litig.*, No. CV-06-105-S-BLW, 2009 WL 453917
(D. Idaho Feb. 23, 2009) .................................................................................................... 16

*In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000) ........................ 33

*In re Montage Tech. Grp. Ltd. Sec. Litig.*, No. 14-CV-00722-SI, 2015 WL 392669
(N.D. Cal. Jan. 29, 2015) ................................................................................................... 45

*In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621,  (S.D.N.Y. 2008)………………………...26

*In re Pfizer Inc. Sec. Litig*., 936 F. Supp. 2d 252 (S.D.N.Y. 2013) ...................................... 20

*In re Questcor Sec. Litig.*, SA CV 12-01623 DMG, 2013 WL 5486762
(C.D. Cal. Oct. 1, 2013) ................................................................................................ 31, 32

*In re REMEC Inc. Securities Litigation,* 702 F.Supp.2d 1202 (S.D.Cal.2010) ..................... 26

*In re Thoratec Corp. Sec. Litig.,* C-04-03168 RMW, 2006 WL 1305226
(N.D. Cal. May 11, 2006) ................................................................................................... 39

*In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193 (E.D.N.Y. 2000) ............................... 33

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490
(W.D. Wash. 2009) ...................................................................46, 47

*In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y. 2003) ................................23, 36

*Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011) .............. *passim*

*Johnson v. Aljian*, 490 F.3d 778 (9th Cir. 2007).................................................... 50

*Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994) ................................................26, 43

*Lopes v. Viera*, No. 1:06-CV-01243 JLT, 2012 WL 691665 (E.D. Cal. Mar. 2, 2012) ........21

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011) .......................................12, 13

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir.2008) ...........31, 39

*Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013) ....................................................41

*Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164 (C.D. Cal. 2007) .............15

*Moxness v. City of Newport*, 89 Or. App. 265, 748 P.2d 1014 (1988) ..................................19

*New York City Employees' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987 (N.D. Cal. 2009) .....15, 49

*Nguyen v. Radient Pharm. Corp.*, 946 F. Supp. 2d 1025 (C.D. Cal. 2013) ..........................39

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
320 F.3d at 920, (9th Cir. 2003) ...................................................................31

*Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424 (9th Cir.1995) .................................... 27

*Official Unsecured Creditors Comm. of Media Vision Tech., Inc. v. Jain*, 215 F.R.D. 587
(N.D. Cal. 2003) ....................................................................................34

*Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959 (9th Cir. 2014) .............................................12

*Petrie v. Elec. Game Card, Inc.*, No. SA CV 10-0252-DOC, 2015 WL 475958, (C.D. Cal.
Feb. 5, 2015………………………………………………………………………….…49

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996) ...........................................................34, 40

*Quaak v. Dexia, S.A.,* 445 F. Supp. 2d 130 (D. Mass. 2006)................................................ 24

*Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*, 2 F. Supp. 2d 1345
(D. Colo. 1998) ..................................................................................................33

*Richardson v. Oppenheimer & Co. Inc.*, No. 2:11-CV-02078-GMN, 2014 WL 1304343
(D. Nev. Mar. 31, 2014) ....................................................................................21

*Rubke v. Capitol Bancorp Ltd.,* 551 F.3d 1156 (9th Cir.2009)........................................... 3, 21

*Samuel v. Frohnmayer*, 82 Or. App. 375, 728 P.2d 97 (1986) ................................18

*Scott v. ZST Digital Networks, Inc.*, 896 F. Supp. 2d 877 (C.D. Cal. 2012)......................... 21

*S.E.C. v. Daifotis*, 874 F. Supp. 2d 870 (N.D. Cal. 2012) ......................................................21

*S.E.C. v. Levin*, No. 12-21917-CIV, 2013 WL 5588224 (S.D. Fla. Oct. 10, 2013) .............. 20

*S.E.C v. McCabe*, 2013 WL 6185035 (D. UT Nov. 26, 2013) ................................................21

*S.E.C. v. Sells,* No. C 11-4941 CW, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ..........1, 16

*S.E.C. v. Todd*, 642 F.3d 1207 (9th Cir. 2011) ...................................................... 34

*S.E.C. v. Wenger*, 427 F.3d 840 (10th Cir. 2005) ................................................22

*S.E.C. v. Zandford*, 535 U.S. 813, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) .......................1, 15

*Simpson v. AOL Time Warner Inc.,* 452 F.3d 1040 (9th Cir.2006) ...........................14, 15, 17

*Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009) ................................26

*Skechers U.S.A. Secs. Litig. v. Skechers U.S.A., Inc.*, 273 Fed. Appx. 626 (9th Cir. 2008)... 31

*Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148
(2008) ...............................................................................................................13, 14, 37

*Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223 (D. Mass. 2004) ..................23, 36

*Takiguchi v. MRI Int'l, Inc.*, No. 2:13-CV-01183-JAD, 2014 WL 4663851
 (D. Nev. Sept. 18, 2014) ........................................................................................20

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.,* 633 F. Supp. 2d 763
 (D. Ariz. 2009)......................................................................................................... 45

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.,* 690 F. Supp. 2d 959 (D. Ariz. 2010) ....................................................................................................43, 45, 46, 47

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .....................14, 25, 26, 35

*Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-02204-PHX-FJM, 2009 WL 275405 (D. Ariz. Jan. 30, 2009) ................................................................................................49

*United States v. Gordon*, 710 F.3d 1124 (10th Cir. 2013)..................................................... 22

*United States v. Perkins,* 937 F.2d 1397 (9th Cir. 1991)………………….….……………….30

*Warshaw v. Xoma Corp.,* 74 F.3d 955 (9th Cir.1996) ............................................................ 4

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc*., 655 F.3d 1039 (9th Cir. 2011)............. 16

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.,* No. CIV. 13-1686 JRT/FLN, 2014 WL 4829274, (D. Minn. Sept. 29, 2014) ...............................................37, 40

**Statutes, Rules, Etc.**

15 U.S.C. § 78j .......................................................................................................................1, 13

15 U.S.C. § 78t–1(a) ...................................................................................................................50

17 C.F.R. § 240.10b–5 .......................................................................................... *passim*

17 C.F.R. § 230.405 ...................................................................................................................48

Restatement (Third) of Agency § 1.01 comment f (2006) .....................................................19

Lead Plaintiffs Kisuk Cho, Anthony Kim, Pantelis Lavidas, and Joseph Buscema, and plaintiff Alan Theriault, ("Lead Plaintiffs," or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss (Dkt. No. ) Lead Plaintiffs' Consolidated Amended Complaint ("CAC") (Dkt. No. 59).[1]

## PRELIMINARY STATEMENT

"The congressional intent in passing [Section 10(b) of the Securities Exchange Act "Exchange Act"] was to inculcate a policy of full disclosure instead of the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *S.E.C. v. Sells,* No. C 11-4941 CW, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012), quoting *S.E.C. v. Zandfor,* 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) (quoting 15 U.S.C. § 78j).

The facts alleged in the CAC tell the story of a classic pump-and-dump scheme wherein Defendants engaged in a stock promotion scheme and disseminated statements into the market inflating the price of Galena securities (*i.e.*, the "pump") in order sell their Galena shares for personal profits of $16 million (*i.e.*, the "dump").  ¶¶2-8.  Galena and its executives were the scheme's primary architects, along with their agents: DreamTeam LLC ("DreamTeam") and Lidingo LLC ("Lidingo").  ¶¶4, 7(b), 72, 73.  Defendants manipulated the market price of Galena stock by publishing bullish articles regarding Galena on third-party websites, falsely claiming to have been written by sophisticated investors and omitting to tell the market that they were paid promotions.  ¶¶78, 89-95, 97-100.  Unbeknownst to the market, the articles were reviewed,

_____

[1] All "¶" references are to the Consolidated Amended Complaint for Violations of the Federal Securities Laws ("CAC"), filed October 31, 2014, (Dkt. No. 59).

approved, and paid for by Galena, which demanded that the articles falsely state that the authors were not paid for writing the articles.  ¶¶89-95, 97-100.  The articles were not written by some community of sophisticated investment professionals who believed Galena was a good investment, but, instead, by DreamTeam and Lidingo who were hired by Galena to tout the stock, using a host of different names and false aliases.  ¶87.  This scheme is exactly the kind of market manipulation the federal securities laws were intended to protect against.

Defendants also made false statements in Galena's filings with the U.S. Securities Exchange Commission ("S.E.C.").  Among other things, they represented that they were not manipulating the price of Galena securities, and made material omissions by not disclosing the stock promotion agreement with DreamTeam/Lidingo.  ¶¶102-113.

Plaintiffs invested in Galena on the reasonable reliance that the articles were independent investment assessments by analysts not otherwise affiliated with Galena or anyone hired by Galena.  ¶225.  There were several articles published on *Seeking Alpha* between July 2013 and February 2014, the time period during which DreamTeam was providing paid promotional services for Galena.  ¶¶89-92, 94-95, 100.  Galena also used its agent Lidingo to, among other things, endorse the promotional pieces it paid for using its agent DreamTeam.  ¶¶78, 80.

The effect of the pumping scheme peaked in January 2013 when the price of Galena stock reached $7.48 per share, its highest price since 2010, which also was the time insiders began selling off all of their holdings.  In February 2013, the price of Galena common stock began to decline when red flags of insider selling alerted bloggers that Galena was significantly overvalued.  A whistleblower – Richard Pearson – then exposed the illicit stock manipulation scheme in an expose in March 2013.  The scheme was confirmed in May 2013 when the SEC announced its

investigation of Galena.  ¶9(e-g).  As the partial disclosures occurred, the price of Galena common

stock declined and eventually fell back to its pre-class period level of approximately $2.00 after

all of the corrective disclosures were revealed.  ¶100, 152.  The stock is currently trading at below

$2.00 per share.

## Material Misrepresentations and Omissions

The CAC alleges that Defendants knew, or recklessly disregarded the fact, that throughout

the Class Period, the articles and the message board posts by DreamTeam and Lidingo authors

never disclosed that they were paid promotions, nor that the authors were using false aliases.  ¶¶5,

89-95, 97-100.  Further, Galena's S.E.C. filings never disclosed that it was involved in any stock

promotions, much less any with members of DreamTeam or Lidingo.   Indeed, *Galena*

*affirmatively declared* in its S.E.C. filings that it was *not* manipulating its stock. ¶¶5, 7(i), 105.

Faced with well-pleaded allegations of material misrepresentations and omissions,

Defendants resort to claiming in their motion papers that they didn't actually make any of the false

statements, or, alternatively, that they did not have a duty to disclose them.  Defendants are wrong

on all counts.

Defendants' primary defense in this Action is that they did not "make" the statements in the

DreamTeam articles under principles articulated in *Janus Capital Grp., Inc. v. First Derivative*

*Traders*, 131 S. Ct. 2296 (2011) ("*Janus*").  Their argument, however, is flawed.  Galena cannot

escape liability for DreamTeam's statements because Galena used DreamTeam and Lidingo to

disseminate false and/or misleading information, to the market.   *See Rubke v. Capitol Bancorp*

*Ltd.,* 551 F.3d 1156, 1166 (9th Cir.2009) (recognizing "that where the plaintiff adequately alleged

that the defendant 'used ... third parties to disseminate false information to the investing public,'

3

the defendant 'cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties' ") (quoting *Warshaw v. Xoma Corp.,* 74 F.3d 955, 959 (9th Cir.1996)).

Unlike the facts in Janus, the CAC describes how Defendants Mark Ahn("Ahn") and Remy Bernarda("Bernarda") exercised final authority over the promotional articles, including the articles' content,  as well as whether and when to publish them.   ¶¶4, 7(b), 84, 89-95, 97-100, 178.   As Defendant Meyer stated to the whistleblower Richard Pearson, "[w]hen I give you an assignment, you will type up the draft and then send back to me so I can get the company's approval. I will send you back the edited version and then you can publish."  ¶147.

Defendants further argue that Lidingo is not alleged to have violated the securities laws, but that is wrong for two reasons.  First, the real issue is whether ***Galena*** violated the securities laws by ***using Lidingo's services***.[2]  Galena used its agent Lidingo to, i*nter alia*, to endorse the promotional pieces of DreamTeam.  ¶¶84, 166.  Galena is liable for its agent Lidingo's failure to disclose that DreamTeam's denials that its pieces were not paid promotions were false.  Second, Lidingo is alleged to have violated the Exchange Act by its own failure to disclose that it, too, was a paid promoter in its endorsements and elsewhere (such as, when it was closely monitoring message boards and inserting pro-Galena messages).  Galena is liable for its agent Lidingo's misrepresentations and omissions in those situations.

**Loss Causation**

The CAC properly pleads loss causation through not only a series of corrective disclosures,

---

[2] Lidingo and DreamTeam have not appeared. Plaintiffs have been unable to effectuate service on either Defendant.

each independently causing a statistically significant decline in the stock, but also through the increase in price on the days the articles were published.  The seven corrective disclosures are as follows:

(a)    January 31, 2014: After news of heavy insider stock sales entered the market, Galena's stock price fell from $7.48 to $5.27 on January 31, 2014, or 29.5%.  ¶¶136.

(b)    February 1, 2014:  After analyst Matt Gravitt revealed that Galena had been paying MissionIR, a DreamTeam "brand," to promote Galena, the stock price fell from $5.27 to $4.22, or about 20% on the next trading day.  ¶¶137-138.

(c)    February 12, 2014:  After Adam Feuerstein revealed that bullish Galena articles had been removed from *Seeking Alpha* for having been penned by false aliases. Galena's stock price fell from $5.22 to $4.26, or about 16.3%.  ¶¶139-140.

(d)    February 14, 2014:  After Ahn admitted that Galena had paid DreamTeam to tout its stock. Galena's stock price fell from $4.36 to $3.73, or about 14%.  ¶¶144-145.

(e)    March 13, 2014:  After analyst Richard Pearson disclosed that executives at both Galena and its former parent, CytRx Corp., had personally reviewed the fraudulent promotional articles before their publication, and that changes to his articles were inputed by Defendant Kriegsman's executive assistant. Galena's stock price fell from $3.25 to $3.02, or 7.1%.  ¶¶146-149.

(f)    March 17, 2014, after close of trading:  After Galena revealed that it was the target of an S.E.C. investigation over the promotion, its stock price fell from $3.22 to $2.82, or about 12 %.  ¶150.

(g)    May 14, 2014:  After Adam Feuerstein revealed the broad scope of the S.E.C.

investigation, with the S.E.C. serving a subpoena in its investigation of Galena, Galena's stock price fell from $2.37 to $2.17, or about 8.4% over the next three trading days.  ¶152.

**Scienter**

The specific facts detailing Defendants' direct knowledge of and participation in the stock manipulation scheme is overwhelming.  Plaintiffs allege numerous detailed facts establishing a companywide practice – orchestrated by Galena's highest-level executives – to boost the Company's stock price through the public dissemination of materially misleading promotional articles about the Company.  ¶¶4, 7(b), 72, 73.  The CAC pleads detailed allegations regarding how Defendants Ahn and Bernarda edited and approved the promotional articles, as well as the roles of the Individual Defendants.  ¶¶4, 7(b), 84, 89-95, 97-100.

Galena's explicit purpose in retaining Lidingo and DreamTeam was to boost Galena's stock price, as confirmed by correspondence between Defendants.  ¶156.  The Defendants regularly measured the promotion's success based on Galena's stock price (and, relatedly, the volume of transactions in Galena's stock) and did not appear to have used any other metric.  *Id.*

Galena insiders tried to conceal that their stock sales were inappropriate-indicating their scienter.  For example, forced to disclose insiders' stock sales on S.E.C. Forms 4, a Galena manager sought "cool ideas/tricks" to file the required forms with the S.E.C. without alerting investors.  ¶131.  Defendant Dunlap suggested Galena voluntarily file numerous insider small "buys" to confuse markets.  *Id.*  In response, Defendant Ahn added: "Got it ... just spoke to John [Burns, a senior Galena manager]. Let's keep these issues to the 3 of us."  *Id.*

In addition to DreamTeam and Lidingo, Galena had hired a legitimate investor relations firm, Tiberend which it was paying about one tenth of what it was paying to DreamTeam and

6

Lidingo. ¶10(a).  In December 2013, midway through the scheme, Tiberend warned Defendant

Bernarda that touting stock without disclosing compensation "border[s] on fraud." *Id.*

## BACKGROUND

Galena was spun off from its parent CytRx Corporation("CytRx") in January 2007.  ¶64.

CytRx remained majority owner until February 14, 2008.  *Id.*  Defendant Kriegsman, CytRx's

CEO, remained a director of Galena after the spin-off.  *Id.*  In connection with the spin off,

Defendant Ahn was appointed director of Galena.  ¶66.  In April 2011, Galena acquired Apthera,

Inc., a private biotechnology company located in Oregon, and Defendant Ahn became CEO of

Galena as part of the transaction.  ¶67.

Galena's only commercial-stage product is Abstral® ("Abstral"), a propriety form of

fentanyl, an opiate analgesic, used to treat breakthrough cancer pain (sudden episodes of pain that

occur despite around-the-clock treatment with pain medication).  At least four other companies,

however, already offer generic fentanyl in the United States.  ¶¶69-70.  Galena was far from

achieving financial success from selling Abstral, disclosing in its 10-K for the year ended

December 31, 2013, that:

> We have only recently initiated our product launch of Abstral, our only approved
> product. We have a history of net losses and negative cash flows from operation
> and have not sold any other products, and cannot predict of or when we will become
> profitable . . . . We are unable to predict when, if ever, that we will generate profits
> from the sale of Abstral.

¶71.

## The Pump

Beginning July 2013, Galena paid two separate promoters to tout its stock—DreamTeam

and Lidingo.  ¶73.  As part of this campaign, DreamTeam drafted positive articles about Galena

and also recruited other parties to draft additional articles, which thereafter were sent directly to Defendants Ahn, or Bernarda.  ¶¶78, 85, 147.

Ahn and Bernarda reviewed, edited, and approved the articles for publication. ¶¶85, 89-95, 97-100.  DreamTeam published the articles on a variety of third-party platforms, most importantly *Seeking Alpha*, the leading website used by analysts and professional and institutional investors to publish independent analysis and original investigative journalism related to investments.  Links to the published articles thereafter were emailed to Ahn and Bernarda.  ¶¶3, 7(a-b), 78, 170.  There were several articles published on *Seeking Alpha* touting Galena during the time period which DreamTeam was providing paid promotional services for Galena.  ¶¶89-92, 94-95, 100.

Galena's rule of the promotional campaign was that the articles could not disclose that they were paid promotions.  ¶¶5, 7(d), 85.  Indeed, all the articles published on *Seeking Alpha* affirmatively state, just below the title, "***I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it.***"  ¶7(d).  Anyone clicking a link to or viewing any published *Seeking Alpha* article would see this disclosure.  *Id*.  Ahn has admitted that he "pa[id] attention to *Seeking Alpha*".  ¶182.  Galena, however, did more than just "pay attention" to it.  During the Class Period, Galena sued a writer for defamation over a *Seeking Alpha* article within days of its publication, admitting in its complaint that *Seeking Alpha* "is very influential in investment circles, particularly the bio-tech sector."  ¶212.

Galena's requirement that the promoters omit that they were paid promoters is a *per se* violation of the federal securities laws, which mandate that stock promoters disclose all compensation they have received.  The articles were published under a variety of bylines – either the actual names of the third parties who were recruited to draft the articles, or fake aliases created

by DreamTeam, which were created at the behest of Galena to make it appear to investors that several independent sophisticated professionals believed in the profitability of Galena stock. ¶7(e). Lidingo, for its part, issued false statements in the form of email "blasts" and third-party message boards about Galena, "work[ing]" them to ensure the messages there express a consistently positive opinion of Galena. ¶7(f). The CAC describes how Defendants Ahn and Bernarda exercised final authority over the promotional articles, including the articles' content, whether and even when to publish them. ¶¶4, 7(b), 84, 89-95, 97-100, 178. Indeed, Defendant Meyer told whistleblower Pearson: "[w]hen I give you an assignment, you will type up the draft and then send back to me so I can get the company's approval. I will send you back the edited version and then you can publish." ¶147. Galena's S.E.C. filings did not disclose its promotional scheme. ¶¶5, 7(i), 105.

The Campaign worked, more than tripling Galena's stock price during the Class Period. ¶8(b). Many of the articles caused Galena's stock price to increase 10% in a single day. ¶7(g). Between July 2013 and January 2014, Galena's stock price rose from about $2 per share to $7 per share. *Id*. In fact, in September 2013, after the publication of the first DreamTeam article alleged in the CAC, Galena was able to conduct a $37.5 million public offering of common stock and warrants based on the inflated price of its stock. ¶223.

**<u>The Dump</u>**

Galena held a meeting of its compensation committee on November 22, 2013—the same day a false promotional piece was published on *Seeking Alpha*. ¶¶95, 114. At the Company's Board of Director's Meeting, lavish stock options were granted to Defendants, with each director

receiving 200,000 options with a strike price of $3.88-- *an unprecedented options award valued at $516,000 for each recipient:*

| Name | Position/Title | Number of Options | Total 2013 compensation |
|------|----------------|-------------------|-------------------------|
| Mark Ahn | President, CEO & a Director | 600,000 | $3,099,363 |
| Brian Hamilton | EVP & CMO | 300,000 | $930,339 |
| Mark Schwartz | COO | 300,000 | $1,583,640 |
| Ryan Dunlap | Chief Accounting Officer | 150,000 | $684,410 |
| Rudolph Nisi | Director | 200,000 | $633,470 |
| Stephen Kriegsman | Director | 200,000 | $628,220 |
| Sanford Hillsberg | Director | 200,000 | $671,220 |
| Stephen Galliker | Director | 200,000 | $749,720 |
| Richard Chin | Director | 200,000 | $610,970 |
| William Ashton | Director | 200,000 | $706,670 |

*See* ¶115. The timing of the option grants was unusual because as the 2014 Proxy Statement acknowledges, Galena typically awards options at the end of each fiscal year or in January of the immediately following fiscal year. ¶116.

At the beginning of 2014, Defendants had reason to believe that the stock promotion deal with DreamTeam could be discovered, causing many of them to engage in a significant number of high-volume, single day sales of their personally held stock. ¶128. On January 16, 2014, Galena's stock price reached its peak of $7.48, its highest level since 2010. ¶8(b). Then, in a period of less than one month, between January 17, 2014 and February 12, 2014, certain of the Galena Defendants sold virtually their entire holdings (a period of eighteen trading days). *Id.*

Beginning January 17, seven Galena insiders dumped their shares, selling 2.9 million shares for a combined total of more than $16 million. ¶128. Six of the selling insiders sold between 87 and 100 percent of their Galena shares; the seventh sold 19.6% of his shares. *Id.*

| Name | Date | Shares | Sale Price | Proceeds | Percentage of |
|------|------|--------|------------|----------|---------------|

| Name | Date | Shares | Sale Price | Proceeds ($) | Percentage of total holdings sold |
|---|---|---|---|---|---|
| Kriegsman | 1/23/2014 | 150,000 | $5.92 | 888,540 | |
| | 1/22/2014 | 250,000 | $6.13 | 1,532,500 | |
| | 1/17/2014 | 200,000 | $7.00 | 1,400,000 | |
| **Total** | | 600,000 | | 3,821,040 | 96.8% |
| **Name** | **Date** | **Shares** | **Sale Price** | **Proceeds ($)** | **Percentage of total holdings sold** |
| Hillsberg | 1/30/2014 | 250,000 | $5.41 | 1,352,500 | |
| | 1/17/2014 | 200,000 | $6.93 | 1,385,000 | |
| **Total** | | 450,000 | | 2,737,500 | 93.3% |
| **Name** | **Date** | **Shares** | **Sale Price** | **Proceeds ($)** | **Percentage of total holdings sold** |
| Nisi | 1/29/2014 | 250,000 | $5.41 | 1,320,000 | |
| | 1/17/2014 | 200,000 | $6.93 | 1,380,000 | |
| **Total** | | 450,000 | | 2,700,000 | 98.6% |
| **Name** | **Date** | **Shares** | **Sale Price** | **Proceeds ($)** | **Percentage of total holdings sold** |
| Chin | 2/12/2014 | 187,500 | $4.33 | 812,438 | |
| | 1/30/2014 | 75,000 | $5.57 - $5.61 | 418,755 | |
| **Total** | | 262,500 | | 1,231,193 | 100% |
| **Name** | **Date** | **Shares** | **Sale Price** | **Proceeds ($)** | **Percentage of total holdings sold** |
| Galliker | 2/3/2014 | 300,000 | $4.18 | 1,253,040 | |
| **Total** | | 300,000 | | 1,253,040 | 96.8% |
| **Name** | **Date** | **Shares** | **Sale Price** | **Proceeds ($)** | **Percentage of total holdings sold** |
| Schwartz | 1/30/2014 | 100,000 | $5.57 | 556,500 | |
| **Total** | | 100,000 | | 556,500 | 19.6% |
| **Name** | **Date** | **Shares** | **Sale Price** | **Proceeds ($)** | **Percentage of total holdings sold** |
| Ahn | January 27, 2014 | 796,765 | Sale at $4.83 per share | 3,848,374 | |
| **Total** | | 796,765 | | 3,848,374 | 87% |
| **Total - All Defendants** | | **2,959,265** | | **16,147,647** | |

The stock sales were not made pursuant to pre-arranged Rule 10b5-1 trading plans, and none of the selling Defendants had sold Galena stock on the open market in the previous four years.

## ARGUMENT

## I.    PLAINTIFFS PROPERLY PLEAD § 10(B) CLAIMS FOR SECURITIES FRAUD

### A.    <u>Applicable Standards</u>

On motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), courts are required to accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1013 (9th Cir. 2005). The purpose of a 12(b)(6) motion is to test the sufficiency of the complaint, not to decide the merits. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1015 (S.D. Cal. 2005). Moreover, in a securities fraud action, a court must consider the statements at issue collectively in the context in which they are made. *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 970 (9th Cir. 2014); *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011). As the Supreme Court has cautioned, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the fact finder." *Bell At. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* at 556. "But so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Sciences Sec. Litig.,* 536 F.3d 1049, 1057 (9th Cir. 2008).

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person ... to use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations the SEC may prescribe." 15 U.S.C. § 78j.  S.E.C. Rule 10b–5(a) forbids any person "to employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b–5(a).  S.E.C. Rule 10b–5(c) also forbids any person "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5(c). SEC Rule 10b–5 implements Section 10(b) of the Exchange Act by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx,* 131 S. Ct. at 1317 (*quoting* 17 C.F.R. § 240.10b–5(b)).[3]  "In particular, whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact." *Id.* at 1017 (citing *Fecht v. Price Co.,* 70 F.3d 1078, 1081 (9th Cir.1995)).

"[S]*cienter* may be established, by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. S.E.C.,* 595 F.3d 1034, 1041 (9th Cir. 2010)(citations omitted).  In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007) ("*Tellabs II*"), the U.S. Supreme Court held: "[t]he inquiry is whether all the facts alleged, taken collectively, give rise to a strong inference of *scienter,* not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 324.  To

---

[3] To establish a violation of § 10(b) and Rule 10b–5, plaintiffs must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

13

plead *scienter* in the context of scheme liability under Rule 10b–5(a) and (c), a complaint must allege that the defendant engaged in deceptive conduct with scienter. *Simpson v. AOL Time Warner Inc.,* 452 F.3d 1040, 1047 (9th Cir.2006), *vacated on other grounds,* 552 U.S. 1162, 128 S.Ct. 1119, 169 L.Ed.2d 945 (2008).  Taken as a whole, the CAC alleges facts giving rise to a strong inference that each Defendant acted with *scienter*.  Accordingly, Defendants' motion should be denied.

### B.  Plaintiff's Properly Plead Scheme Liability Against Galena, Ahn, Bernarda, DreamTeam and Lidingo

Defendants do not challenge the allegations of scheme liability in their motion to dismiss because they cannot.  A pump-and-dump scheme is exactly the type of market manipulation Section 10(b)-(5)(a) and (c) of the Exchange Act were designed to prevent.  A defendant who uses a "device, scheme, or artifice to defraud," or engages in "any act, practice, or course of business which operates or would operate as a fraud or deceit," can be liable by virtue of his conduct alone. *See Stoneridge,* 552 U.S. at 158 ("[t]o suggest there must be a specific oral or written statement before there could be liability under § 10(b) or Rule 10b–5 [ ] would be erroneous. Conduct itself can be deceptive ....").  Courts have often called liability arising under Rule 10b–5(a) or (c) "scheme liability." *Id.* at 159, 128 S.Ct. at 770.  "To be liable for a scheme to defraud, a defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Sells,* 2012 WL 3242551, at *5.  "The statute should be interpreted flexibly to effectuate its remedial purpose." *Id.   Burnett v. Rowzee,* 561 F.Supp.2d 1120, 1125 (C.D.Cal.2008).

To properly allege scheme liability, a plaintiff must show that each defendant is a "primary violator[.]" *Central Bank of Denver, N.A. v. First Interstate Bank of Denver N.A.,* 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Simpson,* 452 F.3d at 1048.  In the Ninth Circuit,

14

"to be liable as a primary violator of § 10(b) for participation in a 'scheme to defraud,' the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Id.* at 1048.  Thus, the Ninth Circuit has held that "[i]f a defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud, then the defendant is using or employing a deceptive device within the meaning of § 10(b)." *Id.* at 1050; *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1191-92 (C.D. Cal. 2007)(upholding scheme liability for options backdating).[4]

The Supreme Court has repeatedly recognized that defendants who engage in deceptive "acts" or "conduct" may be primarily liable under Ruled 10b-5(a) and (c), so long as the other primary elements of Section 10(b) are adequately alleged.  *See, e.g.*, *Zandford*, 535 U.S. at 820. "While Rule 10b-5(b) addresses liability for material misstatements or omissions, Rules 10b- 5(a) and (c) encompass conduct beyond disclosure violations." *N.Y. City Emps. Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 995 (N.D. Cal. 2009); *see also Hawaii Ironworkers Annuity Trust Fund v. Cole*, No. 3:10CV371, 2011 WL 1257756, at *6 (N.D. Ohio Mar. 31, 2011) *on reconsideration in part*, No. 3:10CV371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011), *as amended* (Sept. 7, 2011) ("Conduct can be deceptive and provide a basis for primary liability."); *In re Micron Tech., Inc., Sec. Litig.*, No. CV-06-105-S-BLW, 2009 WL 453917, at *1 (D. Idaho Feb. 23, 2009) (*Stoneridge* inapplicable to "scheme liability" claims against primary actors); *cf. WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) ("A defendant may only be liable as part

---

[4] *Janus* only addressed liability under 10(b)-5(b) and does not foreclose liability under 10(b)-5(a) and (c). *Sells*, 2012 WL 3242551, at *7; *Hawaii Ironworkers Annuity Trust Fund v. Cole*, No. 3:10CV371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011).

of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions.").

Here, in addition to their liability for making the misleading statements in the promotional articles under Rule 10b-5(b) (Count I), the CAC also alleges that all of the Defendants are also independently liable for their deceptive **conduct** under Rules 10(b)-5(a) & (c). *See Sells*, 2012 WL 3242551 at *5.

Galena violated the securities laws, and specifically Rules 10(b)5-(a) & (c), by employing DreamTeam and Lidingo to write, publish, and publicize the promotional articles without disclosing the promotional campaign to investors. Defendants schemed to manipulate the price of Galena securities by creating a host of voices – authors to write the articles, third parties to link to them or discuss them, touts on message boards to call the articles to investors' attention and shout down critical articles. The purposes of the promotional campaign were to boost the price of the stock so that insiders could sell their personal shares, and to allow the Company to have a secondary offering at an inflated stock price. Under scheme liability in the Ninth Circuit, Galena and its officers and directors role in this pump-and-dump scheme had "the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud, [and therefore they are] using or employing a deceptive device within the meaning of § 10(b)." *Simpson,* 452 F.3d at 1052. There were at least seven articles published on *Seeking Alpha* between July 2013 and February 2014, the time period during which DreamTeam was providing paid promotional services for Galena. Galena used its agent Lidingo, *inter alia*, to endorse the promotional the promotional pieces it paid for using its agent DreamTeam.

Lidingo was an integral part of that scheme as well. Among other things, Lidingo

16

"monitored" and "worked" Galena-themed message boards, generated independent coverage for Galena, and paid writers for positive Galena articles. ¶¶78, 80. Lidingo also used aliases to tout the fraudulent promotional articles. ¶80. Both DreamTeam and Lidingo's promotions were pervasive and highly misleading. For example, shortly after an August 6, 2013 article on Galena was published, several posters on Yahoo! Finance boards called attention to it, with one adding "I'm buying more [Galena stock] tomorrow." *Id.*

As confirmed by contemporaneous correspondence, Galena's explicit purpose in hiring Lidingo was to boost its stock price. ¶156. In its initial campaign, Lidingo guaranteed a partial refund if Galena's stock price did not increase by at least 25%. *Id.* Galena then timed its stock offerings to coincide with Lidingo's services. ¶157. Galena used Lidingo because it "offer[ed] a layer of protection; a safe [...] option" as opposed to running its own pump-and-dump scheme. ¶167. Further, Lidingo was awarded Galena stock options, and thus had an incentive to buttress its stock price, which was a violation of Galena's internal policies and was a material fact that Defendant Ahn failed to disclose to shareholders. ¶¶73, 175. Plaintiffs' scheme liability claims arise from their fraudulent acts and practices, including the fact that the Company's changes to DreamTeam/Lidingo articles were passed along to Defendant Meyer through Company through Michael McCarthy … in an effort to conceal the Insider Defendants' direct involvement in the stock manipulation scheme. This is quintessential deceptive conduct under Rule 10b-5(a) and (c). 17 CFR 240.10b-5(a), (c).

Further, Lidingo violated the Exchange Act on its own by endorsing articles without disclosing that it was paid to do so. Since Galena entangled itself into Lidingo's violations, they are attributable to Galena.

17

C.    **Defendants' Materially False Statements and/or Omissions**

1.    **False Statements and Omissions in Galena's S.E.C. filings and Press Releases**

The CAC alleges that Galena's S.E.C. filings were replete with false statements and omissions made by the Galena Defendants about the promotional campaign. Galena issued S.E.C. reports and press releases during the Class Period failing to disclose its stock promotion agreement with DreamTeam and Lidingo, and failed to disclose that the reason for its rising stock price was the stock promotion scheme. ¶¶105-111. Galena also affirmatively misrepresented that *it was not manipulating the price of its stock.* ¶¶5, 105.

2.    **Galena's False Statements and Omissions in Promotional Articles**

Ahn and Bernarda incorrectly assert that, while they may have authorized and controlled the content of the promotional articles, they did not "make" any of the statements contained therein because a "third party" published them. *See* Dkt. No. 81 at 8; Dkt. No. 82 at 11.

a.    **Defendants Made False Statements Through Their Agents, DreamTeam and Lidingo**

Under Oregon law, "[a]gency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Samuel v. Frohnmayer*, 82 Or. App. 375, 379, 728 P.2d 97, 99 (1986). Control can be manifested by, for example, where a principal controls the cases an agent must investigate, see *id.* at 100, or the patients a doctor must treat and the scope of his treatment,[5] or a principal controlled where a specific task was done, when it was done, and had the right to inspect and direct performance. *Moxness v. City of Newport*, 89 Or. App. 265, 268, 748

---

[5] *Bridge By & Through Severson v. Carver*, 148 Or. App. 503, 510, 941 P.2d 1039, 1042 (1997).

P.2d 1014, 1016 (1988). "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." Restatement (Third) of Agency § 1.01 comment f (2006).

Galena controlled and had the right to control DreamTeam. ¶218. The CAC shows that Galena exercised control over the published articles, including the articles' content and whether and when to communicate them. ¶¶28, 30, 85, 89-100. Richard Pearson independently confirmed that Galena's management edited and authorized the promotional articles. ¶¶146-148. Galena also directly controlled the fraud by demanding that the articles not state that they were paid promotional materials. ¶146. Indeed, having submitted an article, Meyer related how he was under Galena's direction: "G[alena] is just slow my friend [...] I can't make them approve when I say, it's up to them unfortunately." ¶148. Similarly, Galena could put a hold on articles (¶186 (c)) or make DreamTeam obtain legal advice (¶186 (d)-(e)).

Here, because Galena controlled or had the right to control them, DreamTeam and Lidingo were acting as Galena's agent when they made misrepresentations and omissions about Galena. Under the doctrine of *respondeat superior* DreamTeam's and Lidingo's misconduct is imputed to Galena, because the DreamTeam Defendants were acting within the scope of their agency.[6]

### b.    *Janus* is Inapplicable to the Facts Present Here

The issue before the court in *Janus*, was whether a mutual fund "investment advisor" could be held liable under Exchange Act Rule for false statements made in mutual fund prospectuses

---

[6] "Thus, a complaint generally is sufficient to state a claim for vicarious liability based on application of the doctrine of *respondeat superior* if it states ultimate facts that, if true, would establish that an [agent] was acting within the scope of [agency] when the employee allegedly committed the acts that led to plaintiff's injury." *Fearing v. Bucher*, 328 Or. 367, 373, 977 P.2d 1163, 1166 (1999).

filed by its client, which was a "separate legal entity owned entirely by mutual fund investors" with its "own board of trustees." *Janus*, 131 S. Ct. at 2299, 2305.  The *Janus* Court explained that the advisor was not liable because it did not have sufficient "authority" or "control" over the statements of a legally separate entity, including "its content and whether and how to communicate it." *Id.* at 2302, 2305-06.  Thus, that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Takiguchi v. MRI Int'l, Inc*., No. 2:13-CV-01183-JAD, 2014 WL 4663851, at *6 (D. Nev. Sept. 18, 2014).

Here, Galena, Ahn, Bernada and Dunlap had the ultimate authority and control over the statements disseminated to the investing public by the DreamTeam and Lidingo Defendants. Indeed, DreamTeam and Lidingo were Galena's agents in effecting the Company's promotion scheme. Although DreamTeam and Lidingo defendants may have "crafted" and "published" the articles in assisting Galena's scheme, "this assistance [was] subject to the ultimate control" of Galena, Ahn, Bernada and Dunlap.  Accordingly, even under the holding in *Janus*, Ahn, Bernada and Dunlap are liable for the statements made or disseminated by DreamTeam and Lidingo. *See In re Pfizer, Inc. Sec. Litig.,* 936 F. Supp. 2d 252, 269 (S.D.N.Y. 2013) (holding corporate officers with ultimate authority "made" statements under *Janus*).

Although "*Janus* explicitly declined to rule on the question of what constitutes making statements to the public." *See S.E.C. v. Daifotis*, 874 F. Supp. 2d 870, 881 (N.D. Cal. 2012).  "[I]n the wake of *Janus,* an executive who undisputably exercised authority over his own non-casual statements with the intent and reasonable expectation that such statement would be relayed to the investing public, should be deemed to be the person who 'made' the statements to the investing

public (so long as it is proven that the statement was made to the investing public)).” *Id.*; *accord S.E.C. v. Levin*, No. 12-21917-CIV, 2013 WL 5588224, at *14 (S.D. Fla. Oct. 10, 2013) (same); *Richardson v. Oppenheimer & Co. Inc.*, No. 2:11-CV-02078-GMN, 2014 WL 1304343, at *8 (D. Nev. Mar. 31, 2014) (same); *Scott v. ZST Digital Networks, Inc.*, 896 F. Supp. 2d 877, 890-91 (C.D. Cal. 2012)(rejecting applicability of *Janus* for underwriter defendants finding that underwriters were “instrumental not only in preparing or assisting with the relevant statements, but that [the underwriter] can, in fact, be said to have ‘issued’ them.”).  Moreover, in *Janus*, “[t]he Court further clarified ‘as long as a statement is made, it does not matter whether the statement was communicated directly ***or indirectly*** to the recipient.”  *Lopes v. Viera*, No. 1:06-CV-01243 JLT, 2012 WL 691665, at *5 (E.D. Cal. Mar. 2, 2012) (emphasis added).  Thus, here, neither Galena, Ahn, Brenarda, nor Dunlap can escape Liability for DreamTeam’s and Lidingo’s statements.  *See Rubke v*, 551 F.3d at 1166.

### 3.    Material Omissions

During the Class Period, the market was never informed of the fact that authors of articles published as part of the scheme were required to have Galena sign off on the articles prior to publication, or that the authors could not disclose that they were compensated to write the promotional articles.  Courts have found such omissions to be material.  For example, in *S.E.C. v. McCabe*, 2013 WL 6185035, *6 (D. UT Nov. 26, 2013), a case  with almost identical facts, *i.e.*, whether a paid promoter’s false aliases and compensation were material, the court found that a reasonable investor would find such information material:

> When seeking insight into the stock market in the hope of investing wisely, the reasonable investor would likely find it important that a stock advisor was being paid at that time to promote certain stocks and that the advisor’s recommendations were not impartial. Defendant’s publication of two different newsletters under

pseudonyms underscores the materiality of this information. Defendant bolstered the recommendations in the Elite Stock Report with the other two newsletters. Consequently, Defendant was able to manipulate the other information available in the market—providing confirmation that the recommendations in the Elite Stock Report were impartial and well founded. Subscribers to the Elite Stock Report would consider it important that the publisher of the Elite Stock Report was being paid to promote recommended stocks in other publications.

The *McCabe* Court further found that misrepresenting one's credentials was material because defendant promoted his credentials to convince investors to follow his advice to purchase the stock. *Id.; see also S.E.C. v. Wenger*, 427 F.3d 840 (10th Cir. 2005)(court affirmed the publisher's conviction for securities fraud under § 10(b) for failing to disclose material facts[selling stock on the company being promoted] that would have affected his subscribers' decisions to invest in the recommended stocks.); *United States v. Gordon*, 710 F.3d 1124 (10th Cir. 2013)(lawyer convicted of securities fraud under 10(b) for a stock promotion pump-and-dump scheme).

The articles here purported to have been written by analysts – indeed, well-pedigreed analysts, including several portfolio/fund managers.  They were endorsed by numerous purported third parties on message boards, social media, blogs, and in other articles, all purporting to be convinced by the articles' thesis. Indeed, between August 2013 and January 2014, anyone who researched Galena as an investment would find a cacophony of voices that agreeing that Galena was a great investment, with the promotional articles DreamTeam and Lidingo drafted setting out the reasons why.[7] Many courts have held that analyst's statements of their own subjective opinion are or can be material.  *See, e.g.*, *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 55 (D.

---

[7]Though Galena Defendants mock certain of the articles' authors pen names, Defendants understand that most authors use "pen names" on these websites; however, false aliases purporting to be different people to pump the price of the stock is categorically different.

Mass. 2006).[8]    Indeed, courts have certified actions alleging that analysts' buy or sell recommendations moved market prices.  *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 300.[9]

### 4.    Defendants Had a Duty to Disclose

The Officer Defendants' assertion that they had no duty to correct any of the materially misleading statements and omissions contained in the published promotional articles or S.E.C filings is baseless.  *See* ¶¶52, 67, 126.  Relying heavily on one distinguishable out-of-circuit case (*Garvey v. Arkoosh*, 354 F. Supp. 2d 73 (D. Mass. 2005)), the Defendants suggest that they had no duty to disclose their financial relationship with DreamTeam and Lidingo.  Dkt. No. 82 at 15, 16, 19, 41.  Even that case, however, holds that "the approach taken by the securities laws – in practical recognition of the fact that most market research is performed by analysts who are paid by brokerage firms, investment banks, and other marketers of securities – is to require disclosure of the fact that the analyst has been paid."  *Garvey*, 354 F. Supp. 2d at 83.  In this case, the analysts are ***Galena's agents***. Galena and the Officer Defendants' obligation to disclose the scheme is thus no more than their obligation to correct their own false and misleading statements and omissions.

Moreover, unlike the defendants in *Garvey*, who provided numerous disclosures warning investors, the Defendants here provided no warnings.  *See, e.g.*, ¶89-100. To the contrary, the promotional articles assured investors that they were the work of independent analysts with no connection to Galena.  *Id*.  Galena's, Ahn's, Bernarda's and Dunlap's duty to correct false

---

[8] *See also In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 297 (S.D.N.Y. 2003); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 238 (D. Mass. 2004); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 298 (S.D.N.Y. 2003).

[9] *See also DeMarco v. Robertson Stephens Inc.*, 228 F.R.D. 468, 472-73 (S.D.N.Y. 2005); *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 28 (D. Mass. 2008); *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 269 (D. Mass. 2005).

statements is simply one aspect of their obligation to reveal necessary, material facts about Galena – including the fact that they solicited, edited and approved the highly misleading promotional articles prior to publication without disclosing payment. *See id*. Indeed, Defendants virtually ignore Plaintiffs' allegations concerning the Officer Defendants' false statements, including Defendants' misrepresentations in their own public filings that Galena had "not taken, directly or indirectly, any action designed to or that might cause or result in … manipulation of the price" of Galena's shares. ¶201.

Here, where the promotional articles assured investors that they were the work of independent analysts with no connection to Galena, they had a duty to disclose the fact that they solicited, edited and approved the highly misleading promotional articles prior to publication without disclosing payment.

This situation is similar to the facts in *Quaak v. Dexia, S.A.,* 445 F. Supp. 2d 130 (D. Mass. 2006). There, an issuer's commercial banker caused its subsidiary's analyst to issue glowing recommendations of the issuer's stock. *Id.* at 134. The commercial banker knew that the analyst report contained false statements because of its intimate knowledge of the issuer's books and records, but the analyst did not. *Id.* at 140. The commercial banker did not make any of the statements, but the court nonetheless held that the commercial banker had made false statements because it had "entangled" itself with the subsidiary, through it the analyst reports. *Id.* at 145-46. Like the commercial banker in *Quaak*, when Galena entangles itself into Lidingo's endorsement, Galena entangled itself into DreamTeam and Lidingo's misconduct. Among other things, Galena received specific updates concerning Lidingo's activities. ¶166. Galena paid Lidingo's writers directly. ¶165. Galena paid Lidingo partly in stock options. ¶73. Galena reviewed the articles

24

and email blasts Lidingo disseminated.   ¶166.   As in *Quaak*, Galena knew that DreamTeam's articles contained false and misleading statements, because it knew that it had paid DreamTeam to publish the articles.   ¶165.   It therefore knew that Lidingo was endorsing articles that made false and misleading statements.    Accordingly, Galena was required to disclose in Lidingo's endorsements that Galena had paid and is liable for the statements it made through both DreamTeam and Lidingo knowing that they were false.

### D.    Plaintiffs Have Properly Pled *Scienter*

The law is clear that "scienter may be established [] by showing that the defendants knew their statements were false [] or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart*, 595 F.3d at 1041(citations omitted).   In *Tellabs II*, 551 U.S. at 326, the Court held: "The inquiry is whether all the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 324.   Under the PSLRA "when determining whether plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002).   However, the "inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'.... [T]he inference of scienter must be more than merely 'reasonable' or 'permissible'— it must be cogent and compelling, thus strong in light of other explanations." *Tellabs II*, 551 U.S. at 323. Taken as a whole, the CAC alleges facts giving rise to a strong inference that each Defendant acted with scienter.   Accordingly, Defendants' motion should be denied.

1.    **Defendants Had Actual Knowledge**

In the Ninth Circuit, Plaintiffs may plead scienter by showing that the defendants had access to facts that contradict their contemporaneous statements or otherwise render them misleading.  *In re Immune*, 375 F. Supp. 2d at 1022.  "The fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."  *Id.* (*quoting Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002)).[10]   Indeed, in the context of an omission case such as this, once the materiality of the omitted information is established as well as the Individual Defendants' knowledge of that information, "the question of scienter is implicitly resolved, insofar as the sufficiency of the pleading is concerned."  *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 639 (S.D.N.Y. 2008).

The Company's *scienter* is derived from the *scienter* of its employees and agents.  *In re REMEC Inc. Securities Litigation,* 702 F.Supp.2d 1202, 1259 (S.D.Cal.2010) (quoting *In re Marsh & Mclennan Companies, Inc. Securities Litigation,* 501 F.Supp.2d 452, 481 (S.D.N.Y.2006)). ("A corporate defendant's scienter is necessarily derived from its employees."); *In re Impac Mortg. Holdings, Inc. Securities Litigation,* 554 F.Supp.2d 1083, 1101 (C.D.Cal.2008) (quoting *In re Apple Computer, Inc., Sec. Litig.,* 243 F.Supp.2d 1012, 1023 (N.D.Cal.2002)) ("A corporation cannot act without human agents, and therefore 'a defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless

---

[10] *See also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1180-81 (9th Cir. 2009) (scienter properly alleged where defendants knew of problems with product but chose not to reveal them); *Kaplan v. Rose*, 49 F.3d 1363, 1375-80 (9th Cir. 1994) (failure to disclose known disappointing trial results when discussing product raised issue of material fact regarding scienter).

26

as to its falsity, at the time that he or she makes the statement.'"); *Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1436 (9th Cir.1995) ("[C]orporate scienter relies heavily on the awareness of the directors and officers, who—unlike the public relations or personnel departments—are necessarily aware of the requirements of S.E.C. regulations and state law and of the 'danger of misleading buyers and sellers.'").

Here, Galena's scienter is derived from its employees (Individual Officer and Director Defendants) and agents (stock promoters who made statements on behalf of the company). The CAC alleges that Defendants knew, or recklessly disregarded the fact, that throughout the Class Period, the articles and the message board posts never disclosed that they were paid promotions, nor that the authors were using false aliases.  As shown above, Defendants had actual knowledge of the scheme.  Further, Galena's S.E.C. filings never disclosed that it utilized such stock promoters either, despite ***affirmatively declaring*** in its S.E.C. filings that it was ***not*** manipulating its stock. The statements were false because the Officer Defendants knowingly paid stock promoters for the sole purpose of inflating the stock.  Defendants also had actual knowledge of the aliases as they were communicated to them by DreamTeam.

Defendants' argument that Plaintiffs lump all Defendants together is misplaced.  As shown below, the CAC sufficiently alleges various actions Ahn, Bernardarda and Dunlap engaged in. Further, each of the Individual Defendants were either Directors or Officers throughout the relevant time period.[11]  The facts alleged lead to a strong inference that Galena, the DreamTeam Defendants (DreamTeam, Thomas Meyer, Michael McCarthy, Lidingo, Mila Bjorn), and the Galena Officer Defendants (Mark J. Ahn, Ryan M. Dunlap, Remy Bernarda) knew of the

---

[11] *See In re Galena Biopharma, Inc. Derivative Litig.*, No. 3:14-CV-382-SI, 2015 WL 455385, at *14 (D. Or. Feb. 4, 2015).

27

fraudulent pump and dump scheme and the false statements and omissions in their own public filings..

### a.    Galena

Throughout the entire pump-and-dump scheme, Galena, through its employees and agents, knew or was reckless in not knowing that:

- Galena hired DreamTeam and Lidingo ¶¶4, 9(d), 72, 76, 158, 199, 205, 206;

- Its purpose of hiring DreamTeam was to raise stock price; ¶156;

- DreamTeam and Lidingo would paint Galena in a positive note; ¶¶80, 166;

- DreamTeam paid its authors; ¶¶84, 165;

- DreamTeam's articles were published on Seeking Alpha, which did not allow paid writers; ¶¶168-171;

- The writers would state that they were not compensated to write the articles; ¶¶7(d), 166,170;

- The authors had multiple aliases and unconfirmed credentials; ¶¶79, 170;

- Galena edited and approved all DreamTeam and Lidingo articles; ¶¶4, 7(a), 7(b), 85, 89-95, 97-100, 147, 178;

- Galena had only one approved product, Abstral, was far from obtaining financial success; ¶71;

Further, the Defendants' actions show that they had a motive to commit fraud:

- Galena adopted a less restrictive insider trading scheme during the scheme; ¶¶119-127;

- Galena allowed insider trading at the peak of stock price; ¶128, 130, 131;

28

- Galena's insiders sold over $16 million worth of stock when they knew of the promotional campaign; ¶128;

- Galena's insider sales were timed to coincide with the stock promoters' efforts. ¶157.

### b.    DreamTeam/Lidingo

DreamTeam itself and through third parties published positive articles to promote Galena. ¶7(a).  DreamTeam paid its writers to draft positive articles and instructed the writers to state on the websites that they were unpaid.  ¶7(d).  DreamTeam and Lidingo published many bullish articles for Galena.  ¶¶89-95, 97-100.  DreamTeam and Lidingo attempted to make the articles seem objective by posting under different aliases on different websites, social media, and message boards.  ¶¶7(f), 78-83.  DreamTeam published the articles under various pen names that purported to be sophisticated investment professionals.  ¶78 and Exh. A.  Lidingo was paid 250,000 options to buy Galena common stock at an exercise price of the price the day the agreement closed to promote the stock.  ¶73.  Further, Galena's special committee investigation found that that Lidingo likely violated the federal securities laws, as did Ahn in hiring it.  ¶189.

### c.    Galena Officer Defendants

In addition to the actual knowledge above, when caught, the Individual Officer Defendants repeatedly covered up their involvement and knowledge, demonstrating their scienter. *United States v. Perkins,* 937 F.2d 1397, 1402 (9th Cir. 1991) (false exculpatory statements are circumstantial evidence of consciousness of guilt); *see also Carlson v. Xerox Corp*. 392 F.Supp.2d 267, 285 (D. Conn. 2005) (false exculpatory statements have independent probative value of scienter).  Ahn concealed from the Board of Directors the fact that Galena's contract with one of

the promoters granted it stock options, which must be issued by the Board.  ¶¶175-176.  When Bernarda was caught by Galena's legitimate investor relations firm, who said what the promoters did "border[ed] on fraud", Bernarda falsely claimed never to have heard of the author of an article she herself or Ahn edited.  ¶178.  Ahn falsely told a reporter that he had sold his shares to diversify his holdings, and then told another reporter Galena insiders had sold the shares because of a nine month blackout – a lie, since Galena's blackout only began in early December 2013.  ¶179.  Ahn falsely told a reporter that the promoters had been hired for a few quarters – actually, since 2008 – and that they had been fired for performance reasons – actually, they had been fired within hours of an investigative journalist's article exposing them.  ¶¶186.  Ahn falsely told a reporter he'd been told the Seeking Alpha articles were written by an independent writer.  ¶180.  The Board falsely stated that Ahn had resigned, when in fact he had been fired for cause.  ¶¶ 191-197.  Further, Galena's special committee investigation found that Ahn had paid Lidingo stock options in violation of company policy and he lied to the special committee.  ¶189.  Bernarda admitted to the special committee that she knew the articles had been published as part of DreamTeam's paid promotion.  ¶85

### 2.    <u>Motive to Inflate Galena Stock</u>

#### a.    Defendants' Stock Sales Create a Strong Inference of *Scienter*

While Plaintiff is not required to allege motive for scienter purposes,[12] unusual or suspicious sales of stock by insiders may be circumstantial evidence of scienter.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003).  Allegations of such sales can "contribute to [the Court's] evaluation of whether a strong

inference of scienter is supported by the entirety of the complaint." *Skechers U.S.A. Secs. Litig. v. Skechers U.S.A., Inc.*, 273 Fed. Appx. 626, 630 (9th Cir. 2008).   Courts generally consider the amount and percentage of shares sold, the timing of the sales, and whether the sales were consistent with prior trading to determine whether the sales of stock by insiders raise a strong inference of deliberate recklessness.   *Am. W. Holding Corp.*, 320 F.3d at 938.   There is no bright-line rule for the amount or of shares sold that is necessary to support an inference of *scienter*.   *In re Questcor Sec. Litig.*, SA CV 12-01623 DMG, 2013 WL 5486762, *15, n.11 (C.D. Cal. Oct. 1, 2013).

Here, the amount, and percentages of stock sold by the Individual Defendants, when compared to sales before the Class Period, as well as the timing of those sales, support a strong inference of *scienter*, especially "when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1066–67 (9th Cir.2008) (quotation marks and citation omitted).

Shortly after the stock was promoted by DreamTeam and Lidingo, and the stock promotion pushed the price of Galena stock to its highest level in four years, six Galena officers and directors sold almost all their stock: Kriegsman (96.8%), Hillsberg (93.3%), Nisi (98.6%), Chin (100%), Galliker (96.8%), and Ahn (87%).   Schwartz also sold 19.6% of his holdings.   ¶128.   None of the Defendants had sold any Galena shares prior to January 2014, and none of the defendants have sold Galena shares after February 2014.   ¶128.   The amounts and timing of the stock sales support a strong inference of *scienter*.   *See Questcor*, 2013 WL 5486762, at *15 (sales of 30.84%, 60.44%, and 50.54% supported strong inference of scienter); *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHX), 2008 WL 2676364, at *14 (C.D. Cal. July 1, 2008) (sales of 18% and 7% of

31

holdings supported strong inference of scienter when made at suspicious time).

Further reinforcing Defendants' *scienter*, the stock sales were in violation of both company policy and a specific blackout that was disclosed to the Defendants. At the time of the stock sales, Galena had two mutually inconsistent insider trading policies: one provided that stock could only be sold with Ahn's explicit authorization, the other that sales were restricted to pre-announced trading windows. ¶119. Both prohibited stock sales while in possession of material non-public information (as, indeed, do the securities laws). The 2014 stock sales violated both policies. ¶122.

Galena Defendants assert that their sale of virtually all their stock in the last two weeks of January 2014 was only because of a blackout that had prevented their earlier sale. But they omit to mention that the blackout had only begun in December 2013 and by its terms actually extended until March 2014. ¶233. Thus, since the Galena Defendants ignored the blackout when it was convenient to do so, the blackout simply serves as a convenient excuse to explain the stock sales after the media learned of Galena Defendants' pump-and-dump scheme.

Galena held a Board of Directors meeting on January 16, 2014. ¶126. The Board minutes claim that at the meeting, Galena's Board discussed insider trading, and decided that it would allow trading by officers and directors. ¶127. In fact, though, when they were later interviewed, none of the Board members remembered discussing insider trading at that meeting. ¶127. Further, Board members had wildly different understandings of Galena's insider trading policy – suggesting that they had, in fact, not discussed insider trading at all. Thus, the January 16 Board minutes appear to have been doctored by the defendants after the fact to make it appear that the Board had authorized the transactions-the argument they make here..

In fact, contemporaneous emails show that the Defendants understood their stock sales

were inappropriate.  Galena's attorney demanded that Kriegsman be allowed to trade even though he had material non-public information because "he seems insistent, if you know what I mean." ¶123.  Galena solicited "cool ideas/tricks" to fool the markets. ¶131.  Dunlap suggested that insiders buy small amounts of company stock so they could file Forms 4 announcing the purchases, providing camouflage to the Forms 4 that would announce the much larger sales. ¶131.  Ahn, Dunlap, and a manager agreed to "keep these issues to the 3 of us." ¶131.

### b.    The Secondary Offering Raises an Inference of *Scienter*

Galena made a secondary offering during the Class Period, which coincided with the inflated price of Galena common Stock.  Such an offering gives rise to a strong inference of scienter.  *See Daou*, 411 F.3d at 1023; *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 648 (E.D. Va. 2000) (defendants' desire to raise capital through public offerings probative of scienter); *In re Complete Mgmt., Inc. Sec. Litig*., 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (same); *In re Lason, Inc. Sec. Litig.*, 143 F. Supp. 2d 855, 858-59, 861 (E.D. Mich. 2001) (same).  Courts typically find secondary offerings suspicious when they are used to raise money for a company using artificially inflated stock.  *See In re Twinlab Corp. Sec. Litig*., 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) ("to inflate the stock price to maximize revenue from the secondary offering, so as to provide it capital" is a sufficient allegation of motive); *Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp*., 2 F. Supp. 2d 1345, 1359 (D. Colo. 1998) (same).  The CAC alleges detailed facts demonstrating that Galena was using the promotional articles to boost the price of the Company's shares in the period before consummating the Secondary Offerings.  ¶¶103-108.

### 3.    Ahn and Brenarda's Conduct Violated Galena's <br> Written Internal Policies

The Ninth Circuit heretofore has inferred *scienter* where "defendants appear to have

violated [the company's] own policies." *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996); *S.E.C. v. Todd*, 642 F.3d 1207, 1217 (9th Cir. 2011); *Official Unsecured Creditors Comm. of Media Vision Tech., Inc. v. Jain*, 215 F.R.D. 587, 588 (N.D. Cal. 2003).  Here, at all relevant times, Galena's "Code of Ethics and Conduct" were designed to prevent insiders from trading on information "which might be of interest to persons considering the purchase or sale of our stock." ¶112.  Its insider trading policy expressly prohibited the Company and the Officer Defendants from buying or selling securities while in possession of material nonpublic information.  But Defendants violated Galena's Code of Ethics when they sold over $16 million of shares in January 2014, when they knew (a) Galena's earnings for the year ended December 31, 2013, and (b) that Galena had hired DreamTeam and Lidingo to unlawfully promote its stock.  Further, Galena's special committee investigation found that Ahn had paid Lidingo stock options in violation of company policy and he lied to the special committee about violating the policy.  ¶189.

### 4.    Plaintiffs' Inference of Fraud is More Compelling and Cogent

Defendants' explanation for their dubious activities is that they had no knowledge that they were paying DreamTeam to pump the stock, and that their insider sales were merely coincidental. However, as shown above, Defendants had actual knowledge of the stock promotion scheme and were motivated to profit off of insider sales.  Defendants knowingly hired DreamTeam to pump up the stock and recklessly failed to disclose the promotional campaign, including failure to disclose compensation and identities of the authors.  Defendants subsequently dumped almost all of their holdings at the first chance they could to profit  from the scheme.  This inference is "cogent and at least as compelling" as Defendants proffered explanation and therefore satisfies the pleading standard for *scienter*.  *See Tellabs II*, 551 U.S. at 324.

E.     **Reliance is Properly Alleged**

Reliance can be presumed from the materiality of the omission under *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741(1972). *In re J.P. Jeanneret Associates, Inc.,* 769 F. Supp. 2d 340, 358 (S.D.N.Y. 2011).

1.     **Reliance is properly alleged under Section 10(b)(5)(b)**

Lead Plaintiffs plausibly allege reliance through the fraud-on-the-market presumption.  In certain informationally rich markets, dubbed "efficient markets", prices reflect "all publicly available information, and, hence any material misrepresentations."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2409 (2014) ("*Halliburton II*") (*quoting Basic Inc. v. Levinson*, 485 U.S. 224, 246, 108 S. Ct. 978, 991 (1988)).  False statements are then incorporated into the stock price, and investors who buy the stock pay for the false statements. Investors' reliance on the false statements, therefore, is presumed.  *Halliburton II*, 134 S. Ct. at 2408.

*Basic*, held that the price of a stock includes "all publicly available information", and that the market "inform[s the investor] that ***given all the information available to it***, the value of the stock is worth the market price," 485 U.S. at 242, 244 (emphasis added).  Citing nothing at all, Defendants declare that an analyst's bias is not information "about the company and its business" and therefore has no impact on its stock price. Def. Mem. at 29.  Defendants ignore *Basic*'s holding that the price of a security in an efficient market reflects all public information, including information about analysts' and market participants' views of the company.   Contrary to Defendants' unsupported theory, *Basic* Court did not hold that only information about the company or its business could have an impact on its stock price.  Here, whether analysts favored Galena's stock affects the price of Galena's stock by purporting to show increased demand for it.

Indeed, the federal courts have resoundingly rejected Defendants' arguments in a similar context, holding that an analyst's false statement that she has no bias or believes a stock to be a good investment is material information that can move an issuer's stock price. *See, e.g.*, *In re Credit Suisse-AOL*, 465 F. Supp. 2d at 55; *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d at 297; *Swack*, 383 F. Supp. 2d at 238; *In re WorldCom*, 219 F.R.D. at 298. Courts routinely certify classes of investors who claim they were misled by false analyst buy recommendations or analyst failures to disclose conflicts of interest in the face of the same arguments Defendants raise here, under the efficient markets theory. *DeMarco*, 228 F.R.D. at 472-73; *In re WorldCom*, 219 F.R.D. at 300; *see also Hevesi v. Citigroup Inc.*, 366 F.3d 70, 78-79 (2d Cir. 2004) (holding that whether analyst opinion had an impact on market price in efficient market was a serious question). And the SEC agrees that analyst opinion is incorporated into a company's stock price, having filed an amicus brief indicating that "[n]othing in *Basic* or in the underpinnings of the [fraud-on-the-market] theory itself justifies excluding analysts from the presumption's reach." *In re Worldcom, Inc. Sec. Litig.*, Case No. 03-9350, Brief of the Securities and Exchange Commission as Amicus Curiae, 2004 WL 3564452, at *4 (2d Cir. 2004) (attached as Exhibit 1 to the Leigh Handelman Smollar Declaration). Hence, Plaintiffs have pled allegations that support a presumption of an efficient market and, thereby, reliance.

## 2.    Reliance is properly alleged under Section 10(b)-(5)(a) and (c)

Although Defendants have not briefed the issue, Plaintiffs have also properly pleaded a presumption of reliance under scheme liability. Plaintiffs can satisfy the reliance requirement by alleging facts sufficient to show (1) that defendants substantially participated in a fraudulent scheme; and (2) when the scheme is viewed as a whole, the plaintiffs relied on it. *In re Lernout &*

*Hauspie Sec. Litig.*, 236 F. Supp. 2d 16, 1741 (D. Mass. 2003). Here, Plaintiffs have alleged facts sufficient to show that they relied on the pump-and-dump scheme under the fraud-on-the-market theory. *See Basic*, 485 U.S. at 241–250. Plaintiffs allege that the pump-and-dump scheme artificially inflated the price of Galena's common stock during the Class Period, allowing Defendants to reap over $16 million in profits from their scheme. The scheme here created the false impression that there was a sophisticated investment community that unanimously believed that Galena was a good investment – suggesting that there was a great demand for Galena's stock. The scheme alleged is separate and distinct from the alleged false statements and omissions. *See W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.,* No. CIV. 13-1686 JRT/FLN, 2014 WL 4829274, at *27-28 (D. Minn. Sept. 29, 2014)(distinguishing scheme liability from *Stoneridge*).

In *Stoneridge,* the Supreme Court rejected scheme liability claim because it was based on conduct that was presented to the public only through a public statement, which happened to be the basis of the plaintiffs' false statement claim. *Stoneridge*, 552 U.S. at 153–55, 128 S.Ct. 761. This case parallels *W. Virginia Pipe Trades Health & Welfare Fund*, where, the plaintiffs alleged that the defendants had conspired with medical practitioners to manipulate the contents of medical publications about its product. *Id.* at *2, *8. The defendants argued that because the scheme centered on false statements in medical publications, there was no deceptive "conduct". *Id.* at *26. But the court there held, as the Court here should, that in addition to their own false statements, the plaintiffs had alleged a distinct scheme based on the **conduct** to **cause others to make** false statements about the company, just as here, the Galena Officer Defendants caused Galena's agents the Promoter Defendants to make false statements. *Id.* at *27.

37

### F.     Loss Causation is Properly Alleged

The CAC adequately alleges loss causation and price impact. The Supreme Court in *Halliburton II*, found that *at the class certification stage*, defendants may rebut reliance by showing lack of price impact.  134 S. Ct. at 2416.  However, *Halliburton II* made no mention of how a plaintiff can prove price impact.  *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-CV-5571 SAS, 2014 WL 4080950, at *2 (S.D.N.Y. Aug. 18, 2014).  The Fifth Circuit in *Halliburton* found that one way to show price impact is by showing that the price of the stock increased upon the false statements and/or material omissions, and decreased upon the corrective disclosures.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 718 F.3d 423, 432 (5th Cir.) *cert. granted,* 134 S. Ct. 636, 187 L. Ed. 2d 415 (2013) and *vacated and remanded,* 134 S. Ct. 2398, 189 L. Ed. 2d 339 (2014); *see also IBEW Local 98 Pension Fund v. Best Buy Co.*, No. CIV. 11-429 DWF/FLN, 2014 WL 4746195, at *6 (D. Minn. Aug. 6, 2014)("price impact can be shown by a decrease in price following a revelation of the fraud.").  That the Court did not address ***how*** to prove price impact suggests that it found the Fifth Circuit's common-sense explanation sufficiently uncontroversial.

In any case, the CAC alleges (i)that the false statements caused Galena's stock price to be artificiall inflated, and (ii) that a series of partial disclosures caused the nflation to be removed from the price of Galena stock.

First, the CAC alleges seven partial disclosures (January 16-30, February 3, February 12, February 14, March 13, March 17, and May 14).

- January 16-30:  The first partial disclosure—the Galena Defendants' stock sales, which the Galena Defendants claim is not a corrective disclosure, but they cite a case in which the plaintiffs did not argue that stock sales were a corrective disclosure. *Corinthian*

*Colleges*, 540 F.3d at 1063.  But even if the stock sales were not corrective disclosures in that case, which was not a pump-and-dump, the **dump** is a disclosure that there is a **pump-and-dump scheme**.  *See In re Maxim Integrated Products, Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1048 (N.D. Cal. 2009) (disclosure of the fraudulent scheme is a corrective disclosure).

- *February 3*:  The second partial disclosure is that Galena had paid for stock promotions, which the author of the corrective disclosure discovered by specifically looking for it on an obscure website specializing in the matter.  The Galena Defendants do not dispute that this partial disclosure related to these false statements. Rather, the Galena Defendants claim that the disclosure did not reveal anything that wasn't already known, essentially a truth-on-the-market defense, which is not appropriate at the pleading stage.  *Nguyen v. Radient Pharm. Corp.*, 946 F. Supp. 2d 1025, 1035 (C.D. Cal. 2013).  A truth-on-the-market defense, is an "inappropriate basis for finding an insufficient pleading of scienter and falsity."  *In re Thoratec Corp. Sec. Litig.,* C-04-03168 RMW, 2006 WL 1305226 (N.D. Cal. May 11, 2006).  "[C]ourts generally may not dismiss a complaint on the basis of a truth-on-the-market defense to a fraud-on-the-market theory."  *Id.*, citing *Cf. Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 167 (2d Cir.2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.").[13]  In any

---

[13] *See also Medtronic, Inc.*, 2014 WL 4829274, at *27-28 (rejecting defendants' argument that adverse events were fully disclosed on the FDA website, finding "[t]o base dismissal on this argument, the Court would need to investigate and compare the disclosures on the relevant websites with the findings of all the articles Plaintiffs cite as having been manipulated. …These inquiries are suitable for trial or summary judgment, but are too fact dependent to be resolved at the pleading stage."

event, here that defense fails on its merits.  Galena Defendants must show the obscure website had "transmitted" the truth with a "degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations," *Provenz*, 102 F.3d at 1493, which they cannot do because the obscure website did not transmit anything, but instead only made information available for search.

- *February 12 and March 13*: On both of these days, the only Galena-specific news that entered the market was disclosure of the promotional scheme.[14]  New information entered on both days – with Mr. Feuerstein's article, that several of the Seeking Alpha articles attributed to independent analysts had in fact been paid promotional articles, and with Mr. Pearson's, that CytRx insiders (including Galena director Steven Kriegsman) had personally edited the articles.

- *February 14:* The fourth disclosure is Ahn's admission that Mr. Feuerstein's article was accurate, which provides additional information that Defendants were actively engaged in the fraud.

- *March 18 and May 7*: the revelation that the S.E.C. was investigating and that its investigation had a wide scope.  Here, the S.E.C.'s investigation is not a revelation of wrongdoing, but is rather the materialization of the risk that wrongdoing would draw regulatory attention.  *See Schleicher v. Wendt*, 529 F. Supp. 2d 959, 967, 973 (S.D. Ind. 2007) (plaintiffs adequately pled loss causation by pleading that false statements about

---

[14] The February 12 Adam Feuerstein article revealed that DreamTeam had published several articles on Seeking Alpha without disclosing compensation and all representing different authorship. Exhibit 1, at ¶139. Galena Defendants' claim to the contrary is incorrect.

guaranty obligations led to company's bankruptcy even though there was no corrective disclosure).[15]  In any event, an S.E.C. investigation can constitute a corrective disclosure.  *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-10-1735-PHX-JAT, 2011 WL 5101787, at *17 (D. Ariz. Oct. 27, 2011).

To further show price impact, Plaintiffs have alleged that the stock price rose a statistically significant amount upon the publication of the promotional materials.  *Best Buy*, 2014 WL 4746195, at *6 ("the Court finds that Plaintiffs have made a sufficient showing that Best Buy's stock price rose after the alleged misstatements and later declined after Best Buy revealed information on December 14, 2010.").   Several articles identified in the CAC– the 8/22/2013,09/26/2013, 09/30/2013, 11/12/2013, 11/13/2013, 11/22/2013, and 1/15/2014 articles – were associated with substantial price increases – namely, respectively, 8.2%, 7.2%, 9.6%, 9.4%, 12%, 15%, and 10%.

Galena Defendants posit, without any support, that Galena's stock price appreciated due to business success.  However, by early 2013, analysts were beginning to question the success of NeuVax, causing a significant drop in the stock price.  *In re Galena*, 2015 WL 455385, at *2.

The only business prospects that were disclosed in the early part of the Class Period were that Galena was earning slim revenues from selling Abstral, one of many Fentanyl variants, and that it had achieved positive ***Phase I*** results for NeuVax.  On January 13 and 14, Galena announced that it had acquired Mills Pharmaceuticals, LLC, and licensed the Indian rights to NeuVax, should there ever be any sales.  This is hardly momentous news, and indeed, Galena's stock price only

---

[15] *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013), cited by Defendants to support the theory that revelation of an S.E.C. investigation does not constitute a corrective disclosure, is distinguishable because news of the S.E.C. investigation revealed the fraud, and was not a consequence of it.

rose from $6.35 to $7.24, returning to $6.38 *by January 21*, a price it would never see again. Moreover, if the positive Galena news was material, Galena's stock price should have remained at or close to $7.  Galena is still selling Abstral, NeuVax's positive Phase I results have not changed, Galena still owns Mills, and NeuVax's Indian rights are still licensed.  Yet as the promotional scheme was disclosed, Galena's stock price quickly fell to $2.33 by the last corrective disclosure – right where it was before the promotional campaign began, and higher than it remains to this day.  Galena Defendants have no explanation for this collapse, showing that Galena's stock price increase had nothing to do with its trivial business "successes."

## II.   THE CAC PROPERLY PLEADS CLAIMS UNDER SECTION 20(a) OF THE EXCHANGE ACT

Galena insiders engaged in the scheme to manipulate Galena's stock price by hiring DreamTeam and Lidingo to tout Galena's stock in a campaign that was a per se violation of the federal securities laws and that embroiled the promoters in making false statements on every article they published on Seeking Alpha. Galena insiders used the DreamTeam defendants and other authors as their agents, and were controlling persons over the campaign.

To plead liability under section 20(a) of the Exchange Act, a Plaintiff must allege that: (1) there is a primary violation of federal securities law, and (2) the Defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, (2000).  "This 'two-pronged test ... should be construed liberally and flexibly.'" *In re Allstate Life Ins. Co.* CV-09-08162-PCT-GMS, 2013 WL 5161688, *5 (D. Ariz. Sept. 13, 2013) (upholding control person liability over a separate entity through an operating agreement).  The Ninth Circuit holds that a section 20(a) claim should be pled in conformity with the notice pleading requirements of Rule 8(a)(2). *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.,* 690 F. Supp. 2d 959,

965-67 (D. Ariz. 2010) (collecting cases). This pleading standard recognizes that scienter and fraud are not elements of a section 20(a) claim. *Id.*

"It is not necessary to show actual participation or the exercise of power to make out a *prima facie* § 20(a) claim in the Ninth Circuit. *Apollo Grp.,* 690 F. Supp. 2d at 971. So, rather than focusing on defendants' alleged actual participation, this court must look to allegations of their participation in the day-to-day affairs of the corporation and the defendants' power to control corporate actions." *Id.* Further, Defendants' attempt to create a pleading standard that simply does not exist. "The determination of a defendant's control over the primary violator 'is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.'" *Rose,* 49 F.3d at 1382 (citing *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396–97 (9th Cir.1993)). *In re Allstate Life Ins. Co. Litig.*, 2013 WL 5161688, at *5.

### A.   Plaintiffs Have Sufficiently Pled that Ahn, Dunlap and Bernarda Established Control Over Galena

Plaintiffs have clearly pled that Galena's officers established control over Galena. The CAC alleges that Ahn:

- was the president, CEO, and a director during the Class Period.  ¶¶28, 67-68, 77;

- was involved in day-to-day management duties of the Company which included, among other things, hiring, paying (at times unilaterally), and firing the stock promotion firms and reviewing/approving articles DreamTeam and Lidingo published (¶¶10(b), 77, 156, 165, 166, 167, 174-176, 178, 185, 186, 189), and approving, modifying, and advising about the company's insider trading policy (¶¶118, 125, 127);

43

- spoke on behalf of the company. ¶144, 179-181);

- controlled DreamTeam's promotional articles by personally reviewing, editing and approving them prior to publication;

- signed all of Galena's S.E.C. statements that Plaintiffs allege were false and misleading. ¶¶103-111. [16]

As to Dunlap, the CAC alleges that Dunlap:

- was Galena's Director of Finance, Controller, corporate Secretary, and later promoted to Senior Director of Finance and CAO, and then became the company's CFO. ¶29,

- was involved in the day-to-day management duties of the Company which included drafting/modifying the Company's insider trading policy (¶¶119-121) and advising about insiders selling shares of Company stock (¶122).

The CAC alleges that Bernarda has been the Company's Vice President of Marketing & Communications and is responsible for Galena's investor and public relations. ¶30. This responsibility is significant as to the issue of control because the content of the statements at issue precisely pertain to the Company's investor and public relations. *In re Epitope, Inc. Sec. Litig.*, No. CIV. 92-759-RE, 1992 WL 427842, at *5 (D. Or. Nov. 30, 1992). Further, Bernarda was involved in the day-to-day management duties of the Company which included advising about hiring investor and public relations firms (¶76) and reviewing, editing and approving articles written by the promotional firms prior to publication(¶¶177-178, 185).

---

[16] Ahn does not contest that he is a control person over Galena. His only argument is that Plaintiffs have not pled Section 10(b) securities violations against Galena and/or DreamTeam, which is wrong. Hence, control person liability against Defendant Ahn stands.

There can be no question that Ahn, Dunlap, and Bernarda's responsibilities in their respective roles, which are certainly the "highest offices in the corporation," "involve speaking frequently on company's behalf" and "making key decisions." *In re Adaptive Broadband Sec. Litig.,* 2002 WL 989478, at *57–*59 (N.D.Cal. Apr. 2, 2002).

Moreover, an officer or director who has signed false S.E.C. filings containing materially false and misleading statements or omissions qualifies as a control person. *Apollo Grp.,* 690 F. Supp. 2d at 971 (citing *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.,* 633 F. Supp. 2d 763, 828 (D. Ariz. 2009) (citing *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008) (in turn, collecting cases)); *Hayley v. Parker*, 2002 WL 925322, at *10 (C.D. Cal. March 15, 20012) (finding that Plaintiffs stated a valid section 20(a) claim against outside director defendants despite lack of allegations of day-to-day oversight where those defendants, *inter alia*, allegedly signed the 10-k form that allegedly reflects fraudulent accounting practices, and they had access to non-public information essential to the case); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, No. 14-CV-00722-SI, 2015 WL 392669, at *9 (N.D. Cal. Jan. 29, 2015) (finding control person liability sufficiently alleged where Plaintiffs alleged individual defendants were officers (CEO, CFO, and President, respectively) and that the individual defendants signed the S.E.C. filings which form the basis of the action).[17] Here, both Ahn and Dunlap signed S.E.C. filings on the Company's behalf.  ¶¶105, 109-110.[18]

---

[17] Ahn and Dunlap signed the August 9, 2013 amended registration statements, and Ahn signed for Hillsberg, Ashton, Chin, Galliker, Kriegsman, and Nisi.

[18] Defendants' reliance on *Neborsky v. Valley Forge Composite Technologies, Inc.* is inapposite.  In that case, Plaintiffs' made only cursory allegations about a Vice President of Engineering and Board member merely stating his executive and directorial positions within the company.  *Neborsky,* No. 13-CV-2307-MMA, 2014 WL 3767011 at *12 (S.D. Cal. July 29, 2014).  The Court there dismissed the claim, finding that Plaintiffs had not even alleged general allegations of control.

**B.**    **Plaintiffs Have Sufficiently Pled that Outside Officer Defendants Established Control Over Galena and/or DreamTeam**

In their motion to dismiss the Outside Directors, Defendants argue that Plaintiffs have not adequately pled facts showing that the Outside Directors exercised power and control over the DreamTeam or Galena.  Defendants' arguments are predicated on erroneous pleading standards. While "being an officer or director does not create any *presumption* of control", director status "is a sort of red light" indicating the potential for day-to-day involvement in a company.  *Apollo Grp.,* 690 F. Supp. 2d at 978 (quoting *Keim*, 994 F.2d at 1397).  Plaintiffs' need only link board membership to the Company's primary violations to establish control person liability for outside directors.  *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 509 (W.D. Wash. 2009) (finding Plaintiffs established control person liability as to outside directors where Plaintiffs asserted that the outside director Defendants controlled the Company by signing the Offering Documents, serving on the Board, participating in the Board's Audit Committee and/or Finance Committee, and alleging that the board had been actively engaged in formulating and overseeing management's implementation of risk management policies which were the subject of the Company's primary violations).

Further, allegations about membership on a committee is significant, especially where the committee duties involved the fraud.  *See Apollo Grp.,* 690 F. Supp. 2d at 976-77 (finding that CAC alleging that outside director had traditional indicia of control such as stock ownership and having a seat on company's board of directors, as well as alleging membership on company's audit committee sufficiently alleged control person status at the motion to dismiss stage) (citing *In re Wash. Mutual, Inc.,* 259 F.R.D. at 509); *see also*, *Fouad v. Isilon Sys., Inc.,* No. C07-1764 MJP, 2008 WL 5412397, at *12 (W.D. Wash. Dec. 29, 2008) (finding that Plaintiffs sufficiently alleged

46

control person liability where they have alleged that Defendant outside directors were members of company's Committee which relates directly to the subject of Plaintiffs' fraud allegations and the Court can infer that the outside directors had control over the very mechanisms intended to prevent the alleged fraud).  In this case the compensation committee consisted of Kriegsman, Chin, and Nisi.  ¶¶32-33, 35, 41.  In November 2013, the compensation committee authorized an award of 200,000 options to all directors.  ¶¶8(a), 114-115.  The award was unusual because Galena had always made awards at the end of the year or in January.  ¶¶8(a), 116.  Shortly after this award, the stock reached its peak and Galena's insiders dumped their shares.  ¶¶8(a), 128.

 Plaintiffs' additional specific allegations as to the Outside Director Defendants further demonstrate the control they exerted over Galena and/or DreamTeam. With respect to Kriegsman, Plaintiffs allege that Kriegsman was the CEO and President of Galena's parent company CytRx (¶¶64, 198).  By virtue of his board membership, signing a document with the S.E.C. that was at the subject of the alleged primary violations, and high-level position with the company that owned Galena, Kriegsman controlled Galana and/or DreamTeam. Taking into account the liberal pleading standards for control person liability at the motion to dismiss stage, Plaintiffs have more than sufficiently alleged that the Outside Director Defendants controlled Galena and/or DreamTeam.

**C.    Plaintiffs Have Properly Alleged That Galena Controlled DreamTeam and Lidingo**

The Galena Defendants further argue that Plaintiffs cannot plausiblye allege control through Galena's contractual relationship with DreamTeam and/or Lidingo; however, Defendants' argument is flawed and belies the definition of control under the Federal Regulations, which specifically includes control by contract.[19]  *17 C.F.R. § 230.405.*  Galena had a contract with both

_____

[19] "Control" is defined in the Code of Federal Regulations as "the possession, direct or indirect, of the power

Lidingo and DreamTeam for the promotional campaign, beginning in July 2013.  ¶¶73, 77.  The

Lidingo contract was signed by Defendant Ahn in his capacity as CEO.  *Id.*  Galena also issued

stock options to Lidingo, which vested immediately, as part of the contractual agreement.  *Id.*

Defendant Ahn actually signed two contracts with DreamTeam, which required Galena to pay

close to $15,000 per month in exchange for the promotional campaign.  ¶77.  Galena not only

authorized the false statements and/or omissions, but also the campaign itself—of which the

purpose was to boost the stock price.  ¶219.  Galena controlled DreamTeam's promotional articles

by personally reviewing, editing, approving and paying for the articles prior to publication.  ¶¶4,

7(b), 85, 89-95, 97-100, 147, 177-178, 185, 217-218.  Galena made substantive changes to the

articles.  ¶9(e).  Indeed, the final content was ultimately up to Galena ("I can't make them approve

when I say, it's up to them unfortunately.").  ¶148.

Galena had the right to compel DreamTeam and Lidingo to deny that the promotional

articles were unpaid.  ¶218.  At the pleading stage, Plaintiffs have properly pled control person

liability against Galena and DreamTeam, who were also primary violators. [20]  Galena significantly

---

to direct or cause the direction of the management and policies of a person, whether through the ownership
of voting securities, by contract, or otherwise." *17 C.F.R. § 230.405.*

[20] Despite Plaintiffs' detailed allegations of control, contrary to Defendants' arguments, at the motion to
dismiss stage, general allegations concerning an individual defendant's title and responsibilities are
sufficient to establish control. *See Petrie v. Elec. Game Card, Inc.*, No. SA CV 10-0252-DOC, 2015 WL
475958, at *7-8 (C.D. Cal. Feb. 5, 2015)(upholding control person liability against directors at the pleading
stage based on general allegations of control); *In re Metawave Communications Corp. Sec. Litig.*, 298 F.
Supp. 2d 1056, 1087 (W.D. Wash. 2003) (finding that Plaintiffs sufficiently pled that Defendants exercised
actual power or control over any primary violators based on their positions as CEO and CFO); *In re Cadence
Design Sys., Inc. Sec. Litig.*, 692 F.Supp.2d 1181, 1194 (N.D. Cal. 2010) (finding the "generalized
descriptions" of individual Defendants' roles within the company "strongly show that Defendants
performed review, control, or accounting functions related to the relevant transactions that were misstated,
and the process by which these transactions were recognized for accounting purposes); *Tsirekidze v. Syntax-
Brillian Corp.*, No. CV-07-02204-PHX-FJM, 2009 WL 275405, at *7 (D. Ariz. Jan. 30, 2009) (finding that
Plaintiffs sufficiently stated a claim at the motion to dismiss stage of the litigation where they allege that
Defendants had the power and influence to control the company); *In re Adaptive Broadband Sec. Litig.*,

controlled the DreamTeam Defendants by employing them and funneling more than "90% of Galena's investor relations expenses" to them as payment (CAC ¶¶9(d), 72, 229). Moreover, Galena directed other of the DreamTeam's activities such as having DreamTeam contact its lawyers. ¶10(b). *See also supra*, section I(C)(2)(a)(describing in detail Galena's control).

## III.   THE CAC PROPERLY PLEADS CLAIMS UNDER SECTION 20A OF THE EXCHANGE ACT

"A § 20A(a) plaintiff must plead (1) that defendant committed a ′34 Act violation "by purchasing or selling a security while in possession of material, nonpublic information"; and (2) facts showing that the defendant's trade occurred "contemporaneously" with a complementary trade by the plaintiff (i.e., if defendant sold that class of security, plaintiff must have purchased that class of security, and vice-versa)." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1202 (C.D. Cal. 2008) (citing 15 U.S.C. § 78t–1(a); *Johnson v. Aljian*, 490 F.3d 778 (9th Cir. 2007)).[21]

---

2002 WL 989478, at *57-*59 ("allegations that the Individual Defendants held the highest offices in the corporation, spoke frequently on its behalf, and made key decisions in how to present its financial results are sufficient to survive Defendants' contention that the Complaint lacks specificity as to control person liability"); *New York City Employees' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 1002 (N.D. Cal. 2009) (finding that Plaintiffs adequately allege Defendant had and used the power to influence or control the primary violator so as to be a culpable participant in the primary violations that took place in the company by alleging that via Defendant's multiple executive posts (General Counsel, Vice President, and Secretary) and membership on the Stock Option Committee, she "had the power and influence to direct the management and activities of the Company and its employees."); *In re Epitope, Inc. Sec. Litig.*, 1992 WL 427842, at *5 (finding that "power to control" was sufficiently pled where Plaintiffs allege that individual Defendants by virtue of their positions as executive officers and members of the Board of Directors, had the ability to scrutinize all transactions involving the company and had access to material, inside information and that they were able to and did control the conduct of the company's business and the content of the statements at issue).

[21] Defendants do not dispute the contemporaneous element for any of the insider trading other than Defendant Schwartz. However, Defendants have ignored the fact that Plaintiff Kisuk Cho purchased shares on January 30, 2014, the same day that Defendant Schwartz sold his shares. ¶¶17, 128. Hence, the trades were contemporaneous under Section 20A.

The Insider Trading Defendants sold their stock on material non-public information—namely, the entire scheme to pump and dump. Defendants were the only ones who knew of the promotional campaign that was designed to boost the price of the stock. When the promotional campaign did just that, Defendants sold their shares on this material non-public information. In addition to the material non-public information relating to the promotional scheme, Defendants had other inside information. For example, on December 19, 2013, Galena's outside counsel Dale Short of TroyGould told Defendant Dunlap that Defendant Kriegsman sought to use options to buy 200,000 shares, immediately selling them for a profit. Kriegsman's sales were forbidden under both the Old Policy (because the sale was not approved by Ahn) and the New Policy (because the sale fell within a trading blackout). ¶122. At the same time, Galena was considering the acquisition of Mills Pharmaceuticals, LLC. *Id.* As a result, Kriegsman had material non-public information about Galena's proposed acquisitions. *Id.* Dunlap advised Short that Kriegsman should not be selling shares. *Id.* (Exh 100). Short responded by asking Galena to break its insider trading policy:

> "Yes, it's an issue, but he seems insistent, if you know what I mean. If the sale is approved, we could caution him in writing of the risk associated with the sale. Let me know if I can give Steve the go-ahead and I will provide the cautionary advice."

¶123. Defendants also traded on the 2013 preliminary earnings, which were provided one day before the Insider Trading Defendants started dumping their shares for massive profits. ¶¶126-127.[22]

---

[22] Without any legal support, Defendant Ahn also claims that despite Plaintiffs' allegations that Ahn traded on non-public material information, 20A insider trading claims fail against him because Plaintiffs have not alleged an inference that he sold his stock based on this information. Defendant Ahn attempts to create a legal standard that does not exist. The standard for establishing a 20A claim in the 9th Circuit is clear—Plaintiffs need only allege that Defendant Ahn sold Galena stock while in possession of material, nonpublic information; and that the trades occurred "contemporaneously." Plaintiffs have clearly met this standard.

## CONCLUSION

For the above reasons, Defendants' motion to dismiss should be denied in its entirety.[23]

Dated: March 6, 2015              Respectfully submitted,


/s/ *Leigh Handelman Smollar* (pro hac vice)
**POMERANTZ LLP**
Patrick V. Dahlstrom
Leigh Handelman Smollar
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel:  (312) 377-1181

POMERANTZ LLP
Jeremy A. Lieberman (pro hac vice)
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: 212-661-1100

-and-

/s/  Phillip Kim (pro hac vice)
THE ROSEN LAW FIRM, P.A.
Laurence M. Rosen (pro hac vice)
Phillip Kim (pro hac vice)
275 Madison Avenue, 34th Floor
New York, NY  10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

Co-Lead Counsel for Plaintiffs


RANSOM, GILBERTSON, MARTIN &
RATLIFF, L.L.P.
Jeffrey Ratliff
1500 NE Irving Street, Suite 412

---

[23] If, however, the Court reaches a contrary conclusion with respect to any of the claims, leave to amend should be granted, particularly as no prior complaint has been dismissed.

51

Portland, Oregon 97232
Tel: 503-226-3664

Liaison Counsel for Lead Plaintiffs and the Class

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who have consented to electronic notification. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all non-CM/ECF participants.

DATED: March 6, 2015

/s/ Leigh Handelman Smollar

53