Jeffrey Ratliff
rgilbertson@qwestoffice.com
**RANSOM GILBERTSON MARTIN
& RATLIFF, LLP**
1500 NE Irving Street, Suite 412
Portland, Oregon 97232
Tel: 503-226-3664
*Liaison Counsel for Plaintiffs*

Leigh Handelman Smollar
lsmollar@pomlaw.com
Patrick V. Dahlstrom
pdahlstrom@pomlaw.com
**POMERANTZ LLP**
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

Jeremy A. Lieberman
jalieberman@pomlaw.com
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
Tel: 212-661-1100

Laurence M. Rosen
lrosen@rosenlegal.com
Phillip Kim
pkim@rosenlegal.com
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
Tel: 212-686-1060
*Co-Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| IN RE GALENA BIOPHARMA, INC. SECURITIES LITIGATION, | CASE No.:3:14-cv-00367-SI<br><br>**DECLARATION OF LEIGH HANDELMAN SMOLLAR IN SUPPORT OF PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |

## DECLARATION OF LEIGH HANDELMAN SMOLLAR

1. I am a partner with the law firm of Pomerantz LLP, Lead-Counsel of record for Plaintiffs and the proposed Class in the above-captioned action. I am a member in good standing with the State Bar of Illinois. I am admitted to practice *pro hac vice* before this Court. I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, could and would testify competently thereto.

2. Attached hereto as **Exhibit 1** is a true and correct copy of Brief of the Securities and Exchange Commission as Amicus Curiae, in *In re Worldcom, Inc. Sec. Litig.*, Case No. 03-9350, 2004 WL 3564452, at *4 (2d Cir. 2004).

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed this 6th day of March 2015 in Chicago, Illinois.

Dated: March 6, 2015

/s/ *Leigh Handelman Smollar*_____
Leigh Handelman Smollar

**Exhibit 1**

Case 3:14-cv-00558-SI   Document 62-1   Filed 03/06/15   Page 4 of 12

In re WORLDCOM, INC. Securities Litigation; Alan G...., 2004 WL 3564452...

2004 WL 3564452 (C.A.2) (Appellate Brief)
United States Court of Appeals,
Second Circuit.

In re WORLDCOM, INC. Securities Litigation;
Alan G. Hevesi, Comptroller of the State of New York, as Administrative Head of the New York State
and Local Retirement Systems and as Trustee of the New York State Common Retirement Fund,
the Fresno Employees Retirement Association, the County of Fresno, and Hgk Asset Management,
Inc., on Behalf of Purchasers and Acquirers of All Worldcom, Inc. Publicly Traded Securities During
the Period Beginning April 29, 1999 Through and Including June 25, 2002, Plaintiffs-Respondents,
v.
Citigroup Inc., Citigroup Global Markets Inc. f/k/a Salomon
Smith Barney Inc., and Jack Grubman, Defendants-Petitioners,
Bernard Ebbers, Scott Sullivan, David Myers, Buford Yates, Jr., James C. Allen, Judith Areen, Carl
J. Aycock, Max E. Bobbitt, Francesco Galesi, Clifford Alexander, Stiles A. Kellett, Jr., Gordon S.
Macklin, John A. Porter, Bert C. Roberts, Jr., John W. Sidgemore, Lawrence C. Tucker, Arthur
Andersen LLP, J.P. Morgran Chase & Co., Banc of America Securities LLC, Deutsche Bank Securities
Inc., Chase Securities Inc., Lehman Brothers Inc., Blaylock & Partners, L.P., Credit Suisse First
Boston Corp., Goldman, Sachs & Co., Ubs Warburg LLC, Abn/Amro Inc., Utendahl Capital, Tokyo-
Misubishi International PLC, Westdeutsche Landesbank Girozentrale, Bnp Paribas Securities Corp.
Cabato Holding Sim S.P.A., Fleet Securities, Inc., and Mizuho International PLC, Defendants.

No. 03-9350.
April 19, 2004.

On Appeal from the United States District Court for the Southern District of New York

**Brief of the Securities and Exchange Commission, Amicus Curiae**

Of Counsel Attorney, Meyer Eisenberg, Deputy General Counsel.

Giovanni P. Prezioso, General Counsel, Jacob H. Stillman, Solicitor, Katharine B. Gresham, Assistant General Counsel, Dominick V. Freda, Attorney, Securities and Exchange Commission, 450 Fifth Street, NW, Washington, D.C. 20549-0606, (202) 942-0994 (Freda).

**\*i** *TABLE OF CONTENTS*

| | |
|---|---|
| TABLE OF AUTHORITIES ................................................................................................................ | ii |
| INTEREST OF THE SECURITIES AND EXCHANGE COMMISSION .................................................. | 1 |
| ISSUE ADDRESSED BY THE COMMISSION ....................................................................................... | 4 |
| SUMMARY OF THE ARGUMENT .......................................................................................................... | 4 |
| ARGUMENT ........................................................................................................................................... | 5 |
| I. *BASIC* AND THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE ............................... | 5 |
| II. APPLICATION OF THE FRAUD-ON-THE-MARKET PRESUMPTION TO SECURITIES ANALYSTS ....................................................................................................................................... | 9 |
| CONCLUSION ........................................................................................................................................ | 19 |

**\*ii** *TABLE OF AUTHORITIES*
CASES

| | |
|---|---|
| Basic Inc. v. Levinson, 485 U.S. 224 (1988) ........................ | 2, 4, 5, passim |

| | |
|---|---|
| Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299 (1985) ................................................................ | 3 |
| Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975) ................................................................ | 3 |
| DeMarco v. Lehman Bros. Inc., ___F. Supp. 2d ___, Nos. 03 Civ. 3470 (JSR), 03 Civ. 3705 (JSR), 03 Civ. 4511 (JSR), 2004 WL 602668, at *3 (S.D.N.Y. Mar. 29, 2004) .... | 13 |
| De Marco v. Robertson Stephens, Inc., No. 03 Civ. 590 (GEL), 2004 U.S. Dist. LEXIS 265 (S.D.N.Y. Jan. 9, 2004) | 13 |
| Dirks v. SEC, 463 U.S. 646 (1983) ...................................... | 14 |
| Heft, Kahn & Infante, Inc., 41 S.E.C. 379 (1963) ................. | 4 |
| J.I. Case Co. v. Borak, 377 U.S. 426 (1964) ........................ | 3 |
| Merrill Lynch, Pierce, Fenner & Smith, Inc., Exchange Act Release No. 14,149, *available at* 1977 SEC LEXIS 412 (Nov. 9, 1977) ..................................................................... | 4 |
| Panzirer v. Wolf, 663 F.2d 365 (2d Cir. 1981) ..................... | 3 |
| *iii  Price Waterhouse v. Panzirer, 459 U.S. 1027 (1982) .... | 3 |
| Robertson Stephens, Inc., Exchange Act Release No. 47,144, 79 SEC Dkt. 850, *available at* 2003 WL 431887 (Jan. 9, 2003) .................................................................. | 4 |
| Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588 (2001) ................................................................ | 18 |
| In re World Com, Inc., Sec. Litig., 219 F.R.D. 267 (S.D.N.Y. 2003) ..................................................................... | 2 |

STATUTES AND RULES

| | |
|---|---|
| *Private Securities Litigation Reform Act,* 15 U.S.C. 78u-4 et seq. (1995) | |
| Section 101(b)(1)(B), 15 U.S.C. 78u-4(b)(1)(B).................... | 17 |
| Section 101(b)(2), 15 U.S.C. 78u-4(b)(2)............................. | 18 |
| Section 101(b)(4), 15 U.S.C. 78u-4(b)(4)............................. | 18 |
| *Barbanes-Oxley Act of 2002* Pub. L. 107-204, 116 Stat. 745, et seq. (2002) | |
| Section 501, Pub. L. 107-204, 116 Stat. 791-93 ................... | 15 |
| *Securities Exchange Act of 1934,* 15 U.S.C. 78a. et seq. | |
| Section 10(b), 15 U.S.C. 78j(b)............................................. | 2 |
| *Rules Under the Securities Exchange Act of 1934,* 17 C.F.R. 240.01, et seq. | |
| Rule 10b-5, 17 C.F.R. 240.10b-5 ......................................... | 2, 3, 5, passim |
| *iv  *Regulation Analyst Certification,* 17 C.F.R. 242.500 et seq. | |
| 17 C.F.R. 242.501(a)(1) ....................................................... | 15 |
| *Rules of Self-Regulatory Organizations* | |
| NASD Rule 2711(f) ............................................................. | 16 |
| NYSE Rule 472(f) ................................................................ | 16 |

COMMISSION RELEASES

| | |
|---|---|
| Exchange Act Release No. 45,908, 67 Fed. Reg. 34968 (May 10, 2002) ........................................................... | 16 |
| Securities Act Release No. 7606A, Exchange Act Release No. 40,632A, 63 Fed. Reg. 67174 (Dec. 4, 1998) ................. | 14 |
| Securities Act Release No. 8119, Exchange Act Release No. 46,301, 67 Fed. Reg. 51510 (Aug. 8, 2002) ............................ | 17 |
| Securities Act Release No. 8193, Exchange Act Release No. 47,384, 68 Fed. Reg. 9482 (Feb. 27, 2003) ........................... | 10 |
| SEC Release 2002-179, *available at* http://www.sec.gov/news/press/2002-179.htm ....................................................... | 4 |
| SEC Release 2003-54, *available at* http://www.sec.gov/news/press/2003-54.htm ......................................................... | 4 |

*v  LEGISLATIVE HISTORY PAGE

| | |
|---|---|
| Analyzing the Analysts, Hearings Before the Subcomm. On Capital Markets, Insurance and Government Sponsored Enterprises of the House Comm. On Financial Services, 107th Cong., Serial No. 107-25 (June 14 & July 31, 2001) ... | 15 |

Case 3:14-cv-00558-SI   Document 62-1   Filed 03/06/15   Page 6 of 12

In re WORLDCOM, INC. Securities Litigation; Alan G...., 2004 WL 3564452...

| | |
|---|---|
| H.R. Rep. 1383, 73d Cong., 2d Sess. 11 (1934) .................... | 8 |
| Senate Comm. On Banking, Housing and Urban Affairs, 107th Cong., Public Company Accounting Reform and Investor Protection Act of 2002, Report to Accompany S.2673 Together With Additional Views, S. Rep. No. 107-205 (June 26, 2002) ...................................................... | 15 |
| The Watchdogs Didn't Bark: Enron and the Wall Street Analysts, Hearings Before the Senate Comm. On Governmental Affairs, 107th Cong., S. Hrg. 107-385 (Feb. 27, 2002) .................................................................. | 15 |
| MISCELLANEOUS | |
| Brad Barber et al., Can Investors Profit from the Prophets? Security Analyst Recommendations and Stock Returns, 56 J. Fin 531 (2001) .................................................................. | 11 |
| Alon Brav & Reuven Lehavy, An Empirical Analysis of Analysts' Target Prices: Short-term Informativeness and Long-term Dynamics, 58 J. Fin. 1933 (2003) ........................ | 12 |
| Brief for the Securities and Exchange Commission as Amicus Curiae, *Basic Inc. v. Levinson,* 485 U.S. 224 (1988) (No. 86-279) ................................................................ | 7, 8, 9 |
| Jeffrey A. Busse & T. Clifton Green, Market Efficiency in Real Time, 65 J. Fin. Econ. 415 (2002) ................................ | 11 |
| Rick A. Cooper et al., Following the Leader: A Study of Individual Analysts' Earnings Forecast 61 J. Fin. Econ. 383 (2001) .................................................................. | 12 |
| *vi  Cristi A. Gleason and Charles M.C. Lee, Analyst Forecast Revisions and Market Price Discovery, 78 Acct. Rev. 193 (2003) ...................................................... | 12 |
| T. Clifton Green, The Value of Client Access to Analyst Recommendations, 1 (2004) (working paper, Emory Univ.), *available at* http:// papers.ssrn.com/sol3/papers.cfm?abstract id=438725 ........................................... | 12 |
| Paul J. Irvine, Analysts' Forecasts and Brokerage-Firm Trading, 79 Acct, Rev. 125 (2004) ........................................ | 12, 13 |
| Zoran Ivkovic & Narisimhan Jegadeesh, The Timing and the Value of Forecast and Recommendation Revisions, ... J. Fin. (forthcoming), *available at* http:// papers.ssrn.com/sol3/papers.cfm?abstractid =359320 .................................... | 11 |
| Laurie Krigman et al., Why Do Firms Switch Underwriters?, 60 J. Fin. Econ. 245 (2001) ........................... | 11 |
| SEC, Investor Alert: Analyzing Analyst Recommendations, *available at* http:// www. sec. gov/investor/pubs/analysts.htm ................................................................ | 10 |
| Scott E. Stickel, The Anatomy of the Performance of Buy and Sell Recommendations, Sept./Oct. Fin Analysts J. 25 (1995) .................................................................. | 11 |
| Kent L. Womack, Do Brokerage Analysts' Recommendations Have Investment Value?, 51 J. Fin. 137 (1996) ................................................................... | 10, 11 |

Note: Table of Authorities page numbers missing in original document

## *1  INTEREST OF THE *SECURITIES AND EXCHANGE COMMISSION*

The Securities and Exchange Commission, the agency responsible for the administration and enforcement of the federal securities laws, submits this brief as *amicus curiae* to address an important legal issue regarding the proper  *2  interpretation

of the fraud-on-the-market presumption of reliance in private securities fraud actions under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.1 0b-5. Under the fraud-on-the-market presumption adopted by the Supreme Court in *Basic Inc. v. Levinson,* 485 U.S. 224 (1988), a plaintiff in a private action under Rule 10b-5 is not required to show direct reliance on a defendant's misrepresentation, but is presumed to have relied on the market price of the security, which reflects all publicly available material information.

This appeal was taken from a district court decision certifying a class of investors, who alleged that they were defrauded in purchasing WorldCom, Inc.'s securities based in large part upon misrepresentations contained in defendants' analyst reports. *In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267 (S.D.N.Y. 2003). In seeking to have the district court's decision reversed, the defendants argue that the fraud-on-the-market presumption, used by the district court in certifying the class, is inapplicable to misrepresentations contained in an analyst's report. The Commission disagrees with this view and believes that the presumption applies to public material misrepresentations by securities analysts. The Commission takes **\*3** no position on whether the class was properly certified or on any of the other legal issues raised by the parties or on any factual disputes. [1]

While the Commission is not required to show reliance in its own enforcement actions, the Commission believes that the proper interpretation and application of the fraud-on-the-market presumption is important to the effective enforcement of the federal securities laws. It is well recognized that private securities actions "provide "a most effective weapon in the enforcement' of the securities laws and are "a necessary supplement to Commission action.' " *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310 (1985) (quoting *J.I. Case Co. v. Borak,* 377 U.S. 426, 432 (1964)); *see Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730 (1975).

The Commission's strong enforcement interest in assuring that the securities markets are not harmed by misrepresentations in analysts' reports is evident in the recent action against ten of the nation's top investment banking firms, alleging that **\*4** their analysts issued research reports that were intentionally exaggerated, unwarranted, or lacked a reasonable basis. *See* SEC Release 2002-179, *available at* http://www.sec.gov/news/press/2002-179.htm; SEC Release 2003-54, *available at* http://www.sec.gov/news/press/2003-54.htm. Indeed, the Commission has for many years brought actions against analysts who engage in such activity. *E.g., Heft, Kahn & Infante, Inc.,* 41 S.E.C. 379 (1963); *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* Exchange Act Release No. 14,149, *available at* 1977 SEC LEXIS 412 (Nov. 9, 1977); *Robertson Stephens, Inc.,* Exchange Act Release No. 47,144, 79 SEC Dkt. 850, *available at* 2003 WL 431887 (Jan. 9, 2003).

### ISSUE ADDRESSED BY THE COMMISSION

Whether the fraud-on-the-market presumption of reliance applies to public material misrepresentations by analysts.

### SUMMARY OF THE ARGUMENT

As adopted by the Supreme Court in *Basic Inc. v. Levinson,* 485 U.S. 224 (1988), the fraud-on-the-market presumption posits that all publicly disseminated material information about a publicly-traded security is reflected in its market price, and that investors rely on the integrity of this price when making a decision to buy or sell the security. When publicly disseminated information about a company or its securities is materially false or misleading, the market price reflects **\*5** this mis-information, and investors relying on the market price have thus indirectly relied on the material misrepresentation.

Nothing in the Court's decision in *Basic* or in the underpinnings of the theory itself justifies excluding analysts from the presumption's reach. Although the Commission takes no position on whether the presumption is applicable to non-issuers other than analysts (an issue that is not before the Court), applying the presumption to analysts is consistent both with economic studies showing the market effect of analyst reports and with the very nature of such reports, which are intended to provide information upon which investment decisions are based.

ARGUMENT

I. *BASIC* AND THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE

The Supreme Court adopted the fraud-on-the-market presumption of reliance in private damages actions under Rule 1 Ob-5 in *Basic,* agreeing with numerous courts of appeals and the Commission's *amicus curiae* brief that there should be a rebuttable presumption that material public information is reflected in the market price of a security and that investors rely on the integrity of this market price in making investment decisions. 485 U.S. at 247.

**\*6** A private plaintiff in a securities fraud action ordinarily must show reliance on a defendant's misrepresentation to provide "the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Id.* at 243. The fraud-on-the-market presumption of reliance addresses the fact that "modern securities markets * * * differ from the face-to-face transactions contemplated by early fraud cases, and our understanding of Rule 10b-5's reliance requirement must encompass these differences." *Id.* at 243-244 (citation omitted). "[T]he market is interposed between the seller and buyer and, ideally, transmits information to the investor in the processed form of a market price." *Id.* at 244 (quotation omitted).

As the Court recognized, "[t]he fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business," and "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id.* at 241-42 (quotation omitted). Proceeding from this hypothesis, the Court held: "Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 **\*7** action." *Id.* at 247. The defendant, in turn, "may rebut proof of the elements giving rise to the presumption, or show that the misrepresentation in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false." *Id.* at 248.

The fraud-on-the-market presumption of reliance, the Court explained, "is consistent with, and, by facilitating Rule 10b-5 litigation, supports, the congressional policy embodied in the 1934 Act," because "[i]n drafting that Act, Congress expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets * * *" *Id.* at 245-46. In addition, the Court held that the presumption is "supported by common sense and probability," pointing to "empirical studies [that] have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246.

The Court's opinion reflects the arguments presented by the Commission in its *amicus curiae* brief. The Commission explained that in addition to "empirical and commonsense evidence" supporting the presumption, it "facilitates important policy objectives underlying the federal securities laws" and " "relieves the plaintiff of an evidentiary burden it is not practical to place on him." Brief for the **\*8** Securities and Exchange Commission as Amicus Curiae at 23, *Basic Inc. v. Levinson,* 485 U.S. 224 (1988) (No. 86-279).

The Commission noted in its brief that "[a] fundamental premise of the Securities Exchange Act is * * * that the markets are affected by information, so that "[t]here cannot be honest markets without honest publicity.' " *Id.* at 25 (quoting H.R. Rep. 1383, 73d Cong., 2d Sess. 11 (1934)). The Commission also noted that courts "have viewed the fraud on the market theory, and the accompanying presumption of reliance, as a means of furthering the statutory goal of ensuring honest securities markets." *Id.* Placing the burden of proof on the plaintiff to show that the market price of a security was affected by a misrepresentation "would impose an unrealistic evidentiary burden" by requiring the plaintiff to present "extensive and hard to obtain evidence" concerning how the information affected the market. *Id.* at 26. The presumption accommodates this concern "by recognizing the obvious, that market prices generally reflect corporate information and that investors generally rely on the integrity of the market price." *Id.* at 27.

*9 **II. APPLICATION OF THE FRAUD-ON-THE-MARKET PRESUMPTION TO SECURITIES ANALYSTS**

Although *Basic* arose in the context of false statements by an issuer, the Supreme Court's opinion does not limit the theory to that context. [2] The Commission believes that applying the presumption to securities analysts is consistent with the "common sense and probability" considerations that led the Court to adopt the presumption in *Basic*.

The Court stated in *Basic* that the theory applies to "any public material misrepresentations * * *." 485 U.S. at 247. The Court further referred to " "available material information regarding the company and its business," without any limitation based on the source of the information. *Id.* at 241 (quotation omitted). The Court noted that the economic studies that led courts to adopt the theory "tended to confirm * * * that the market price of shares traded on well-developed markets reflects all publicly available information * *." *Id.* at 246.

*10 Thus the Court imposed no limitation that the source of the information be the company itself. The Commission believes that applying the presumption to analysts is consistent both with economic studies showing the market effect of analyst reports and with their very purpose - providing information on which to base investment decisions. The Commission takes no position on whether the presumption is applicable to non-issuers other than analysts, an issue that is not before the Court in this case.

Recent economic studies document the market effect of research reports and recommendations by sell-side analysts. [3] These statistical analyses, which examine historical data from a broad set of sell-side research analysts' recommendations and earnings forecasts and historical price data of equity securities in the publicly traded markets, are published by academic researchers in finance and accounting research journals after an extensive peer-review process. [4] Kent L. Womack, *Do* *11 *Brokerage Analysts' Recommendations Have Investment Value?,* 51 J. Fin. 137 (1996), demonstrates that stock prices react within the 3-day period around the time a recommendation is issued and continue to drift in the direction recommended for one or more months. The author concludes that "there is strong evidence that stock prices are significantly influenced by analysts' recommendation changes, not only at the immediate time of the announcement but also in subsequent months." *Id.* at 164. [5] Scott E. Stickel, *The Anatomy of the Performance of Buy and Sell Recommendations,* Sept./Oct. Fin. Analysts J. 25 (1995) concludes that "[b]rokerage house buy and sell recommendations influence stock prices" and that "[t]he strength of the recommendation, firm size, and contemporaneous earnings forecast revisions are associated with price changes that appear to be permanent, information effects." *Id.* at 25. *See also* Jeffrey A. Busse & T. Clifton Green, *Market Efficiency in Real Time,* 65 J. Fin. Econ. 415 (2002); Brad Barber et al., *Can Investors Profit from the Prophets? Security Analyst Recommendations and Stock Returns,* 56 J. Fin. 531 (2001); Zoran *12 Ivkovic & Narisimhan Jegadeesh, *The Timing and Value of Forecast and Recommendation Revisions: Do Analysts Receive Early Peek at Good News?,*___ J. Fin. (forthcoming), *available at http://papers.ssrn.com/sol3/papers.cfm? abstract id=359320.* Prices of securities also react to analysts' issuance or revision of target trading prices (Alon Brav & Reuven Lehavy, *An Empirical Analysis of Analysts' Target Prices: Short-term Informativeness and Long-term Dynamics, 58* J. Fin. 1933 (2003)), and to analysts' issuance or revision of earnings forecasts (Rick A. Cooper et al., *Following the Leader: A Study of Individual Analysts' Earnings Forecasts,* 61 J. Fin. Econ. 383 (2001); Cristi A. Gleason and Charles M.C. Lee, *Analyst Forecast Revisions and Market Price Discovery,* 78 Acct. Rev. 193 (2003)).

Contrary to the defendants' contention that institutional investors ignore the reports of sell-side analysts, studies show that institutional investors do rely on such information. *See* T. Clifton Green, The Value of Client Access to Analyst Recommendations 1 (2004) (working paper, Emory Univ.), *available at http://papers.ssrn.com/sol3/papers.cfm?abstract id=438725* ("Institutional investors pay significant amounts to obtain real-time access to brokerage firm research through providers such as First Call * * *."); Paul J. Irvine, *Analysts' Forecasts and Brokerage-Firm Trading,* 79 Acct. Rev. 125, 126, 147-48 (2004) *13 (clients of brokerage firms, including institutional investors, increase trading in response to recommendations and forecast revisions of brokerage firm analysts). [6]

In addition to the demonstrated market effect of their statements, securities analysts hold themselves out as providing information that investors can use to make decisions on buying and selling securities. As one district court recently observed, an

investment bank "that has a research department engaged in the business of analyzing companies in order to disseminate to the public information and opinions about specific securities clearly intends that the market take into account its recommendations to buy or sell securities." *De Marco v. Robertson Stephens, Inc.,* No. 03 Civ. 590 (GEL), 2004 U.S. Dist. LEXIS 265, at *21-*22 (S.D.N.Y. Jan. 9., 2004). The court rejected the defendants' argument that the fraud-on-the-market presumption should not apply to opinions in analyst reports, stating: "[I]t is disingenuous, to say the least, for defendants to now argue that their published purchase recommendations are somehow excluded from the information available to market actors when valuing securities." *Id.* at 22. *See also DeMarco v. Lehman Bros. Inc.,* ___ F. Supp. 2d___, Nos. 03 Civ. 3470 (JSR), **\*14** 03 Civ. 3705 (JSR), 03 Civ. 4511 (JSR), 2004 WL 602668, at *3 (S.D.N.Y. Mar. 29, 2004) (declining to exempt analysts' reports from fraud-on-the-market presumption because the "very purpose was to advise Lehman's readers to buy stock in a company").

The Commission has "long acknowledged and the Supreme Court recognized in *Dirks v. SEC,* [that] analysts fulfill an important function by keeping investors informed." Securities Act Release No. 7606A, Exchange Act Release No. 40,632A, 63 Fed. Reg. 67174, 67216-17 (Dec. 4, 1998). *See Dirks v. SEC,* 463 U.S. 646, 658 (1983). "They digest information from Exchange Act reports and other sources, actively pursue new company information, put all of it into context, and act as conduits in the flow of information by publishing reports explaining the effect of this information to investors." *Id.* at 67217.

The important role of analysts in the securities markets and the potential that conflicts of interest can influence the integrity of their research reports has been the subject of statutory and regulatory action in recent years. [7] Congress, as part of **\*15** the Sarbanes-Oxley Act, directed the Commission (or, upon the authorization and direction of the Commission, a registered securities association or national securities exchange) to adopt " "rules reasonably designed to address conflicts of interest that can arise when securities analysts recommend equity securities in research reports and public appearances, in order to improve the objectivity of research and provide investors with more useful and reliable information * * *." Sarbanes-Oxley Act of 2002 § 501, Pub. L. 107-204, 116 Stat. 745, 791-93 (2002). [8]

In response, the Commission has approved rule changes by the New York Stock Exchange and the National Association of Securities Dealers prohibiting analysts for member firms from issuing research reports recommending securities for which their firm acted as the manager or co-manager of a public offering during a specified period before and after the offering. NYSE Rule 472(f); NASD Rule 2711(f). In approving these rules, the Commission noted that the purpose **\*16** was to "permit market forces to determine the price of the security in the aftermarket unaffected by research reports issued by firms with the most substantial interest in the offering." Exchange Act Release No. 45,908, 67 Fed. Reg. 34968, 34975 (May 10, 2002). The Commission also adopted Regulation AC - Analyst Certification, which includes measures to assure research analyst integrity and specifically requires analysts' reports to include a statement attesting that the views expressed therein "accurately reflect the research analysts' personal views about any and all of the subject securities or issuers." 17 C.F.R. 242.501(a)(1). [9] In issuing the proposed rule, the Commission stated that "by requiring research analysts to certify as to the accuracy of the views expressed in research reports, investor confidence in the securities markets should be enhanced, thereby leading to the benefit of more liquid and efficient markets." Securities Act Release No. 8119, Exchange Act Release No. 46,301, 67 Fed. Reg. 51510, 51514 (Aug. 8, 2002).

The Commission believes the concerns raised by the defendants and *amicus curiae* Securities Industry Association that applying the presumption to statements **\*17** by analysts will result in securities fraud damages actions against anyone who publicly disseminates a favorable opinion about a security are mitigated by the rebuttable presumption that is part of the fraud-on-the-market presumption of reliance and the barriers against unwarranted suits imposed by the Private Securities Litigation Reform Act, 15 U.S.C. 78u-4 *et seq.*

Many of the arguments that the defendants raise about applying the theory to analysts' opinions - that such opinions are part of an undifferentiated mass of secondary information and do not have any distinct price effects, that major institutional investors whose decisions have an impact on prices do not rely on retail research reports, and that the effects of an analyst's recommendations can be short-lived - seek to rebut the presumption that an analyst's opinion really affected the market price. *See Basic,* 485 U.S. at 248 ("[a]ny showing that severs the link between the alleged misrepresentation * * * and the price

received (or paid) by the plaintiff * * * will be sufficient to rebut the presumption of reliance"). Thus, the defendant could seek to rebut the presumption by showing that any effect was ephemeral or that the particular analyst did not have sufficient influence to actually have an effect on the market price.

The potential for unwarranted actions against anyone who asserts an optimistic view of a company and its securities that proves later proves wrong is ***18** addressed by the Private Securities Litigation Reform Act, especially the provisions requiring plaintiffs to plead fraud with particularity (15 U.S.C. 78u4(b)(1)(B)), to state with particularity facts giving a strong inference that the defendant acted with scienter (15 U.S.C. 78u-4(b)(2)), and to establish that the defendant's fraud caused the plaintiff's loss (15 U.S.C. 78u-4(b)(4)). *See* Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 597 (2001) (noting that concerns about unwarranted securities actions are unlikely "to prove serious in the future" because of the PSLRA, which "impos[ed], beginning in 1995, stricter pleading requirements in private securities fraud actions").

In sum, the Commission believes that the "common sense and probability" considerations that led the Supreme Court to adopt the fraud-on-the-market presumption in *Basic,* a case involving misrepresentations by an issuer of securities, should also apply to misrepresentations by securities analysts.

### *19  CONCLUSION

For the foregoing reasons, the Commission urges the Court to hold that the fraud-on-the-market presumption of reliance applies to public material misrepresentation by analysts.

Footnotes

| | |
|---|---|
| 1 | Although the fraud-on-the-market issue in this case arises in the context of a class action, the fraud-on-the-market presumption applies to all private damages actions under Rule 10b-5 and is grounded on characteristics of the securities markets and investors' behavior and also on policy objectives that are equally applicable to individual and class actions. *See, e.g.,* Panzirer v. Wolf, 663 F.2d 365, 367-68 (2d Cir. 1981) (applying the presumption to an individual plaintiff's Rule 10b-5 claim), *vacated on other grounds sub nom.* Price Waterhouse v. Panzirer, 459 U.S. 1027 (1982). |
| 2 | The Commission's brief in *Basic* framed the issue as whether "the court of appeals in this case correctly held, as has every other court to consider the issue, that a plaintiff alleging fraud under Rule 10b-5 may, in circumstances where a materially false or misleading corporate statement has been disseminated into the trading market, invoke a rebuttable presumption of reliance upon the integrity of the market price." *Id.* at 21 (citations omitted). All of the cases in which appellate courts had adopted the presumption prior to the *Basic* decision involved misrepresentations by issuers. *See id.* at 21 n.24. |
| 3 | "Sell-side" analysts work for investment banks and brokerage firms that sell securities to the public. *See* SEC, Investor Alert: Analyzing Analyst Recommendations, *available at* http://www.sec.gov/investor/pubs/analysts.htm. Their research reports generally contain the analyst's recommendation on the security as well as an analysis. The recommendation is often one word (buy, sell, overweight), while the analysis is often detailed and lengthy, explaining the basis for the rating and providing supplementary information. Securities Act Release No. 8193, Exchange Act Release No. 47,384, 68 Fed. Reg. 9482, 9483 (Feb. 27, 2003). |
| 4 | An article designated as a "working paper" has not yet completed this peer-review process and been accepted for publication. |
| 5 | An indication of how important companies themselves view analysts' reports is shown in a recent article finding that almost a third of companies switch underwriters from an initial public offering to a follow-on offering (within three years of the IPO), and that a key reason that companies switch underwriters is to "buy additional and influential analyst coverage from the new lead underwriter." Laurie Krigman et al., *Why Do Firms Switch Underwriters?,* 60 J. Fin. Econ. 245, 245 (2001). |
| 6 | Irvine notes that "[s]ell-side research analysts must * * * serve the institutional clients who provide commission revenue to their brokers" and that "often brokerage firms conduct a formal poll asking the institutional sales force to rate analysts on how much trade they generate * * *." 79 Acct. Rev. at 125, 126. |
| 7 | In the summer of 2001, the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises of the House Committee on Financial Services held hearings on research analyst conflicts of interest. *See* Analyzing the Analysts, Hearings Before the Subcomm. on Capital Markets, Insurance and Government Sponsored Enterprises of the House Comm. on Financial Services, 107th Cong., Serial No. 107-25 (June 14 & July 31, 2001). The Senate Committee on Governmental Affairs held hearings on |

| | |
|---|---|
| | analysts in early 2002. *See* The Watchdogs Didn't Bark: Enron and the Wall Street Analysts, Hearings Before the Senate Comm. on Governmental Affairs, 107th Cong., S. Hrg. 107-385 (Feb. 27, 2002). |
| 8 | The Senate Banking Committee report recommending enactment noted that the provision was intended to address the "critical" need "to restore investor confidence" in the integrity and credibility of securities analysts. Senate Comm. on Banking, Housing, and Urban Affairs, 107th Cong., Public Company Accounting Reform and Investor Protection Act of 2002, Report to Accompany S. 2673 Together With Additional Views, S. Rep. No. 107-205, at 33 (June 26, 2002). |
| 9 | Regulation AC applies to "research analysts," who are defined as natural persons responsible for preparing a "research report," which, in turn, is defined as "a written communication (including an electronic communication) that includes an analysis of a security or an issuer and provides information reasonably sufficient upon which to base an investment decision." 17 C.F.R. 242.500. |

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.